## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MAAZ QURESHI, individually and on behalf of others similarly situated**, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01141 |
| | ) | |
| **AMERICAN UNIVERSITY**, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| **MATTHEW RABINOWITZ, individually and on behalf of others similarly situated,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01454 |
| | ) | |
| **AMERICAN UNIVERSITY**, | ) | |
| | ) | |
| *Defendant.* | ) | |
| **DANISH ARIF, individually and on behalf of others similarly situated**, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01555 |
| | ) | |
| **AMERICAN UNIVERSITY**, | ) | |
| | ) | |
| *Defendant.* | ) | |

## PLAINTIFFS' SIXTH NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs Maaz Qureshi, Matthew Rabinowitz, and Danish Arif, individually and on behalf

of all others similarly situated (collectively, "Plaintiffs"), hereby provide this Sixth Notice of

Supplemental Authority from other COVID-19 tuition and fee refund actions related to Plaintiffs'

Memorandum in Opposition to Defendant's Motion to Dismiss (ECF 28).

The following opinions and orders deny university defendants' motions to dismiss,

supporting plaintiffs' claims on similar grounds:

## I.   Supplemental Authority

1).   *Patel v. Univ. of Vermont*, Case No. 5:20-cv-00061-GWC, 2021 U.S. Dist. LEXIS 51585 (D. Vt. Mar. 15, 2021) filed herein as Exhibit A.

2).   *Barry v. Univ. of Washington*, Case No. 20-2-13924-6-SEA, Memorandum and Order (Wn. Super. Ct. Mar. 18, 2021), filed herein as Exhibit B.

3).   *Gibson v. Lynn Univ., Inc.*, Case No. 20-CIV-81173-RAR, 2021 U.S. Dist. LEXIS 54324 (S.D. Fla. Mar. 23, 2021), filed herein as Exhibit C.

4).   *Metzner v. Quinnipiac Univ.*, Case No. 3:20-cv-00784-KAD, 2021 U.S. Dist. LEXIS 56744 (D. Conn. Mar. 25, 2021), filed herein as Exhibit D.

This Court also recently issued an order granting the defendant George Washington

University's ("GW") motion to dismiss in the analogous COVID-19 higher education tuition and

fee refund lawsuit, *Shaffer v. The George Washington Univ.*, Case No. 1:20-cv-01145-RJL,

Memorandum Opinion (D.D.C. Mar. 21, 2021), as cited by Defendant.  While on its face the Order

may seem persuasive and unfavorable to the present case, in reality *Shaffer* and *Qureshi* are

inapposite.   *Shaffer* was dismissed because the plaintiffs failed to adequately allege specific,

concrete promises that exhibited the intent for GW to provide in-person-only instruction outside

of generalized statements.  *See Shaffer* at 5-6.  Further, the *Shaffer* plaintiffs failed to adequately

explicate how GW's reservation of rights to alter its programs was unenforceable.

Plaintiffs here have sufficiently pled the existence of an enforceable obligation by

Defendant to provide in-person, on-campus instruction, access to accompanying facilities and

resources, and additional paid-for services.  For example, Plaintiffs have alleged that Defendant

has charged specific, mandatory fees meant to cover particular services, resources, or activities, as promised by Defendant with published and unambiguous descriptions.  Examples include the activity fee, the sports center fee, the technology fee, and the Metro U-Pass fee. Pl. Am. Compl. [ECF 26] ¶¶ 33-37.  Defendant does not offer online-only courses; in fact, Defendant explicitly promises "'a focus on experiential learning.'" *Id.* at ¶ 87.  Defendant promises and promotes a vibrant community, state-of-the-art facilities, and campus amenities. *Id.* at ¶¶ 97-99.  It is simply illogical to infer that Defendant presented these statements in its publications, yet did not intend to be bound by them.  It is therefore important to reiterate the applicable "reasonable expectation" standard in D.C. *See Giles v. Howard Univ.*, 428 F. Supp. 603, 605 (D.D.C. 1977) ("[T]he standard is that of reasonable expectation what meaning the party making the manifestation, the University, should reasonably expect the other party to give it.").

As in *Shaffer*, Defendant here attempts to hide behind its ambiguous and unenforceable reservation of rights and disclaimers.  However, this disclaimer is in fact illusory, purporting to grant Defendant an unencumbered right to unilaterally modify its established contract with students, even in the middle of the semester, with no additional consideration.  The plaintiffs in *Shaffer* failed to effectively argue the unenforceability of GW's disclaimer, unlike in *Qureshi*, wherein Plaintiffs strongly and correctly assert that the provisions are illusory, lack the requisite consideration, and unconscionability of a reservation of the right to one-sidedly alter contractual obligations in the midst of performance. *See* Pl. Memo. Opp. [ECF 28] at 13-14.  Further, Plaintiffs in *Qureshi* unequivocally do not allege educational malpractice.

Defendant also brings to the Court's attention the recent dismissal of the plaintiff's claims in *Zagoria v. New York Univ.*, Case No. 1:20-cv-03610-GBD-SLC, Memorandum Decision And Order (S.D.N.Y. Mar. 17, 2021) another COVID-19 higher education litigation refund case

premised on similar facts. The District Court in *Zagoria* opined that the plaintiff there failed to adequately plead specific promises for in-person instruction and other services. Additionally, the court found that the plaintiff's claim for damages for the Summer 2020 semester was without merit because he voluntarily enrolled in courses he knew would be conducted online. Third, the court treated that plaintiff's claims for unjust enrichment as simply an undifferentiated replication of his breach of contract claims. Unfortunately for Defendant, putting aside the merits of that court's rulings, the *Zagoria* decision is readily distinguishable from the case at bar.

Plaintiffs in the current case cite to numerous, specific promises made by Defendant that are not limited to so called advertisements or scheduled locations, as explained in Plaintiffs' differentiation between *Shaffer* and *Qureshi* above. The court in *Zagoria* references the recent rejections of university-defendants' motions to dismiss in *Ford v. Rensselaer Polytechnic Institute*, 2020 WL 7389155 (N.D.N.Y. Dec. 16, 2020) and *Bergeron v. Rochester Institute of Technology*, 2020 WL 7486682 (W.D.N.Y. Dec. 18, 2020), cases which Plaintiffs here have previously cited as persuasive supplemental authority, wherein the plaintiffs' breach of contract claims persisted because they also referred to specific promises made by defendants as to what students can expect. Plaintiffs also ask this Court to note that the counsel for *Ford* and *Bergeron* are also Plaintiffs' Counsel here and drafted all pleadings and accompanying documents.

Plaintiffs here have also adequately pled unjust enrichment. First, Plaintiffs explicitly state that their claim is "pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim[s]". Pl. Am. Compl. ¶¶ 140, 173. As such, Plaintiffs have adequately pled the elements of the equitable claim of unjust enrichment, wherein "Defendant has received a benefit at the expense of Plaintiffs", "Plaintiffs…paid...for on-campus benefits, access and services and did not receive the full benefit of the bargain", and the benefit

was conferred and realized. *Id.* at ¶¶ 141-152, 175-183.  Plaintiffs' allegations are not a bare recitations of the elements of breach of contract, but instead sufficiently pled claims for unjust enrichment.  The NYU court allowed the plaintiffs leave to amend their complaints.

Plaintiffs respectfully request that the recent decisions cited by Plaintiffs further Plaintiffs' position in this matter in opposition of Defendant's Motion to Dismiss.

[Signatures on Following Page]

Dated: March 26, 2021                    Respectfully Submitted:

**DOUGLAS & BOYKIN PLLC**

/S/: *Curtis A. Boykin*
Curtis A. Boykin, DC Bar 444120
1850 M Street, NW, Suite 640
Washington, District of Columbia 20036
(202) 776-0370
caboykin@douglasboykin.com

**ANASTOPOULO LAW FIRM, LLC**
Eric M. Poulin*
Roy T. Willey, IV*
32 Ann Street
Charleston, SC 29403
(843) 614-8888
eric@akimlawfirm.com
roy@akimlawfirm.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (admitted *pro hac vice*)
Sarah N. Westcot (admitted *pro hac vice*)
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
scott@bursor.com
swestcot@bursor.com

**THE SULTZER LAW GROUP P.C.**
Jason P. Sultzer, Esq. (admitted *pro hac vice*)
Jeremy Francis, Esq. (admitted *pro hac vice*)
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Telephone: (845) 483-7100
sultzerj@thesultzerlawgroup.com
francisj@thesultzerlawgroup.com

*Co-Lead Interim Class Counsel*

**ATTORNEYS FOR PLAINTIFF(S)**

* Admitted via *pro hac vice*

## CERTIFICATE OF SERVICE

     I, Curtis A. Boykin, hereby certify that on March 26, 2021 a true and correct copy of the instant notice was served via the Court's electronic filing system to all counsel of record.

                            /S/:  *Curtis A. Boykin*

                            Curtis A. Boykin

# **EXHIBIT A**

*Patel v. Univ. of Vermont*,
Case No. 5:20-cv-00061-GWC,
2021 U.S. Dist. LEXIS 51585 (D. Vt.
Mar. 15, 2021)

No *Shepard's* Signal™
As of: March 25, 2021 2:22 PM Z

## *Patel v. Univ. of Vt. & State Agric. College*

United States District Court for the District of Vermont

March 15, 2021, Decided; March 15, 2021, Filed

Case No. 5:20-cv-61

**Reporter**
2021 U.S. Dist. LEXIS 51585 *; 2021 WL 1049980

NILAY KAMAL PATEL and RACHEL A. GLADSTONE, Plaintiffs, v. UNIVERSITY OF VERMONT AND STATE AGRICULTURAL COLLEGE, Defendant.

## Core Terms

UVM, tuition, Plaintiffs', refund, in-person, meals, semester, terms, housing, online, catalogue, promise, website, campus, allegations, spring, webpage, breach-of-contract, unjust-enrichment, learning, courts, court concludes, parking fees, pandemic, on-campus, courses, reservation of rights, disclaimers, argues, malpractice

**Counsel:** [*1] For Nilay Kamal Patel, Rachel A. Gladstone, Plaintiff: Amanda L. Lundergan, Esq., PRO HAC VICE, Lundergan Legal, LLC, Royal Palm Beach, FL; Ariane M. Ice, Esq., Ice Legal, P.A., Stratham, NH.

For University of Vermont and State Agricultural College, Defendant: Andrew B. Murphy, Esq., Sean J. Somermeyer, Esq., PRO HAC VICE, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; John J. Collins, Esq., Sharon Reich Paulsen, Esq, University of Vermont, Burlington, VT.

**Judges:** Geoffrey W. Crawford, Chief United States District Judge.

**Opinion by:** Geoffrey W. Crawford

## Opinion

**ORDER ON MOTION TO DISMISS**

**(Doc. 11)**

In October 1918, Vermont media reported that the "Spanish Influenza" was "spreading rapidly" throughout the state. *The Burlington Free Press & Times*, Oct. 7, 1918, at 8. The media reported on a shortage of health workers, the number of cases and deaths, and relayed advice from the United States Public Health Service, including isolating those with symptoms, use of masks and personal protective equipment when caring for the sick, opening windows for ventilation, and avoiding crowds. The University of Vermont postponed its fall semester. *Id.* Vermont state health officials gave blood to prepare an "anti-toxin" to be administered [*2] to university students. *The Burlington Free Press & Times*, Oct. 22, 1918, at 6. The Royall Tyler Theatre—still in use today—was pressed into service as a temporary infirmary.

A century later, a new virus afflicts Vermont and its educational institutions and students. Plaintiffs Nilay Kamal Patel and Rachel A. Gladstone filed this putative class action against the University of Vermont and State Agricultural College ("UVM") on April 21, 2020. (Doc. 1.) Alleging breach of contract and unjust enrichment, Plaintiffs seek "remediation" of UVM's "refusal to provide restitution for tuition, housing, meals, fees, and other applicable costs after the Plaintiffs and similarly situated students were denied services from UVM due to the Novel Coronavirus Disease of 2019 (`COVID-19') pandemic." (*Id.* ¶ 1.) Plaintiffs seek "a refund of all or part of the tuition and fees for which Defendant has been unable to provide the contracted-for services, facilities, access and/or opportunities." (*Id.* 115.) They describe the measure of compensation as "the difference between the value of one half a semester of online learning

versus the value of one half a semester of live in-person instruction." (Id. ¶ 56; see also [*3] id. ¶ 74.)

Currently pending is UVM's motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*. (Doc. 11; see also Doc. 12 (memorandum of law).) Plaintiffs oppose the motion (Doc. 24) and UVM has filed a reply in support of its motion (Doc. 27). The court heard argument on the motion on November 6, 2020, and has also considered the cases cited in the parties' subsequently-filed lists of supplemental authorities (Docs. 35, 36, 38, 40, 44, 46, 49, 51, 53, 55). The court understands that the parties have conferred regarding Plaintiffs' claims for parking and other fees but have been unable to agree about whether UVM has already refunded these fees. (See Doc. 42.)

### Background

Plaintiffs' complaint alleges as follows. Plaintiffs object to the court's consideration of additional facts that do not appear within the complaint. The court addresses that dispute in its analysis below.

### I. Spring Semester 2020 at UVM

Plaintiffs and the putative class members are "individuals who paid either or any combination of the cost of tuition, on-campus housing, meals, and/or fees" for UVM's spring 2020 semester. (Doc. 1 ¶ 13.) Spring semester classes at UVM began on January 13, 2020. (Id. ¶ 14.) Final exams for the semester ended in early May [*4] 2020. (Id.) Prior to the COVID-19 outbreak, students were scheduled to move out of their residences on May 9, 2020.

Plaintiffs and the putative class members paid the cost of tuition, on-campus housing, meals, and fees for the semester in spring 2020. (Id. ¶ 15.) For 12-19 credit-hours, the tuition cost for UVM's 2019-2020 academic year was $16,392 for an in-state resident and starts at $41,280 for an out-of-state resident. (Id. ¶ 16.) Average room and board costs at UVM for the year were $13,354. (Id.) UVM also charges a comprehensive fee and parking fees. (Id. ¶¶ 17, 38.)

Plaintiffs allege that in exchange for these fees, UVM promised a "unique learning and living environment" and a curriculum for which "only a fraction" involved online instruction. (See id. ¶¶ 18, 20.) In support of those propositions, the complaint cites two sources: the UVM undergraduate course catalogue and the UVM website. The UVM undergraduate course catalogue lists a variety of instructional methods, including "Lecture" (LEC), "Independent Study" (IS), "Practicum" (PRAC), "Laboratory" (LAB), "Research" (RSCH), "Hybrid" (HYBD), "Seminar"

(SEM), and "Online" (ONL). (Id. ¶ 19.) Only a "small fraction" of the listed [*5] courses were "online." (Id. ¶ 18.)

The UVM website includes the following statement on a page entitled "Campus Life":

> What's it like here? It's an intimate and diverse community of thinkers and doers. It's a bustling campus with something always going on. It's an outdoor paradise located in one of America's best college towns. At UVM, we're balanced in mind, body and spirit because UVM students seek out opportunities for work, service and play.

(Id. ¶ 20.)[1] The complaint cites this statement in support of the contention that UVM promises students "a unique learning and living environment." (Id.)

### II. COVID-19 and UVM's Response

At UVM, spring break for 2020 was from March 8 through 12; most students were not on campus at that time, but they were expecting to return. (Id. ¶ 23.) On March 11, in response to COVID-19, UVM announced it would be shifting to remote learning starting Wednesday, March 18, and encouraged students not to return to residence halls. (See id.) The announcement stated that "the university will remain open." (Id.) On March 23, 2020, UVM announced that remote instruction would continue for the remainder of the spring semester and said that "[u]ndergraduate students who [*6] currently reside on campus in the residence halls, as well as non-local students who live off-campus, should return to their homes." (Id. ¶ 24.) Most UVM buildings were closed and all student activities were canceled for the remainder of the spring 2020 semester. (Id. ¶ 39.)

### III. Tuition, Housing, Meals, Fees

Members of the putative class have "demanded the return of the unused amounts of funds paid for tuition, for on-campus housing, for meals and for fees, through a number of channels." (Id. ¶ 28.) But UVM has retained the value of payments made by Plaintiffs and other members of the putative class for tuition, on-campus housing, and meals and fees. (Id. ¶ 25.) According to Plaintiffs, "UVM has made clear its policy that it will not return any tuition or fees, and will only provide a minimal credit (not a full return of the pro-rated, unused amounts) for housing and an inadequate future credit for meals." (Id. ¶ 28.) Additional allegations regarding

---

[1] The complaint lists the URL for this webpage as "https://www.uvm.edu/campus_life." (Id. ¶ 20 n.1.)

each category of expense are set forth below.

## A. Tuition

UVM did not offer its students a partial refund of tuition "representing the value of the portion of the academic year that they were forced to use online distance learning platforms **[\*7]** in lieu of live in-person instruction in brick-and-mortar classrooms." (*Id. ¶* 30.) According to Plaintiffs, "[s]tudies have shown that students do not perform as well in an online setting such that their grades, as well as their performance in future classes are negatively affected." (*Id.* 31.) Plaintiffs acknowledge UVM's efforts to continue delivering their education "in some format," but Plaintiffs allege that their "learning experiences have been stymied and disrupted." (*Id ¶* 32.) According to Plaintiffs, they did not get "the full benefit of what they bargained for" when they paid tuition for the spring 2020 semester. (*Id.* 1133.)

## B. On-Campus Housing

The UVM Housing and Meal Plan Contract includes "Terms and Conditions" stating that the University may terminate the contract "[i]n the event of calamity or catastrophe that would make continued operation of student housing infeasible, such as an influenza pandemic." (Doc. 1 1126.) The "Terms and Conditions" also include the following provision regarding "Emergency Closing":

> In the event that the University of Vermont closes due to a calamity or catastrophe beyond its control that would make continued operation of student housing infeasible, such as **[\*8]** a natural disaster, a national security threat, or widespread pandemic flu, room and meal plan fees will not be refunded.

*(Id. ¶* 27.)

UVM offered affected students a "minimal credit (not a full return of the pro-rated, unused amounts) for housing." (Doc. 1 ¶ 28.) UVM offered students a $1,000 credit to their student account if they moved out of their residence hall by March 30, 2020. *(Id. ¶¶* 24, 35.)

## C. Meals

Plaintiffs allege that they and members of the putative class paid for on-campus meals and that, after UVM asked students to leave campus in the spring, they lost access to the food being served on campus. (*Id. ¶* 36.) They allege that UVM "failed to adequately reimburse students with a refund of the

amounts paid (on a pro-rated basis) for meals." *(Id.)* As noted above, UVM offered only a "future credit" for meals, which Plaintiffs characterize as inadequate. (*Id. ¶* 28.) The same Housing and Meal Plan Contract quoted above applies to costs paid for meals.

## D. Fees

Plaintiffs allege that UVM "failed to offer students a refund of any of the fees they paid for the semester that were unused or for which they had not received a benefit." (Doc. 1 ¶ 37.) According to Plaintiffs, examples of such **[\*9]** fees are "the comprehensive fees and parking fees." (*Id. ¶* 38.)

## Analysis

### I. *Rule 12(b)(6)* Standard

To survive a *Rule 12(b)(6)* motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*; *see also Fed. R. Civ. P. 8(a)(2)*. The court must also draw all reasonable inferences in the non-moving party's favor. *Lanier v. Bats Exch., Inc., 838 F.3d 139, 150 (2d Cir. 2016)*. Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)*.

"When deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, courts focus primarily on the allegations in the complaint." *Romano v. Kazacos, 609 F.3d 512, 520 (2d Cir. 2010)*. However, the court may also consider materials that are integral to the complaint or that are appropriate for judicial notice. *Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006)*.

### II. Tuition Claims

Plaintiffs seek tuition refunds on breach-of-contract and unjust-enrichment theories (Counts I and IV). UVM advances three arguments against Plaintiffs' tuition claims. UVM argues that adjudicating the claims would improperly involve the court in matters committed to the discretion of academic institutions. That argument, according to UVM, also precludes Plaintiffs' unjust-enrichment tuition claims. Finally, **[\*10]** UVM argues that Plaintiffs' breach-of-contract

tuition claims fail because they have failed to plead that the terms of the parties' contract included any promise of in-person educational services.

## A. Judicial Deference to Academic Decisions

UVM argues that Plaintiffs' tuition claims fail because the claims are premised on an alleged difference in value between in-person and online instruction. It observes that courts generally decline to review the "soundness or effectiveness of a program or method of teaching." *Connors v. Dartmouth Hitchcock Med. Ctr., No. 2:10-cv-94, 2013 U.S. Dist. LEXIS 205432, 2013 WL 1221826, at *3 (D. Vt. Nov. 13, 2013)* (citing *Ross v. Creighton Univ., 957 F.2d 410, 416 (7th Cir. 1992))*. According to UVM, that doctrine is fatal to Plaintiffs' breach-of-contract and unjust-enrichment claims.

Plaintiffs maintain that the doctrine of academic deference has never been applied to the types of claims that they are raising. (Doc. 27 at 8.) They assert that the doctrine has no application to this case because their claims do not require the court to determine how academic courses should be taught. Instead, Plaintiffs argue that their claims focus on whether UVM "fail[ed] to deliver on specific promises to provide a specific educational experience." (*Id.* at 9.)

"[C]ourts accord deference to the decisions of academic [*11] institutions about the ethical and academic standards applicable to their students . . . ." *Connors v. Dartmouth Hitchcock Med. Ctr., No. 2:10-cv-94, 2013 U.S. Dist. LEXIS 96709, 2013 WL 3560946, at *6 (D. Vt. July 11, 2013)* (citing *Bhatt v. Univ. of Vt., 2008 VT 76, ¶ 15, 184 Vt. 195, 958 A.2d 637*), *opinion supplemented*, 2013 WL 12221824 (D. Vt. Sept. 16, 2013), *supplemental opinion reconsidered in part, 2013 U.S. Dist. LEXIS 205432, 2013 WL 12221826 (D. Vt. Nov. 13, 2013)*. This doctrine of deference is based upon principles of academic freedom and autonomy long recognized by the courts. *See Bhatt, 184 Vt. 195, 2008 VT 76, ¶ 15, 958 A.2d 637* (citing *Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 n.11, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985))*. The doctrine is frequently invoked to counter claims of "educational malpractice." *See Connors, 2013 U.S. Dist. LEXIS 205432, 2013 WL 12221826, at *2-3* (citing cases declining to recognize tort of educational malpractice; noting that such tort claims should be barred because courts "will generally not engage in reviewing the soundness or effectiveness of a program or method of teaching").[2]

But such deference does not extend to all decisions that educational institutions make. Thus, as the court held in *Connors*, academic institutions are not entitled to deference for discriminatory decisions. *Connors, 2013 U.S. Dist. LEXIS 96709, 2013 WL 3560946, at *6*. Of course, this case does not involve any claim of discrimination. But *Connors* also teaches that "[t]he persuasiveness of caselaw rejecting educational malpractice claims diminishes to the extent that [a] claim differs from an educational malpractice claim." [*12] *Connors, 2013 U.S. Dist. LEXIS 205432, 2013 WL 12221826, at *3.*

Here, Plaintiffs do not list "educational malpractice" among the legal theories in their complaint; Plaintiffs' causes of action are for breach of contract and unjust enrichment. (Doc. 1 at 1-2.) The court is mindful, however, that "[a]n educational malpractice claim 'repackaged' as a breach of contract claim should be barred under the same reasoning as an educational malpractice case." *Connors, 2013 U.S. Dist. LEXIS 205432, 2013 WL 12221826, at *3.* The court accordingly focuses on the nature of Plaintiffs' claims seeking tuition refunds.

UVM argues that Plaintiffs' tuition claims ask the court to take the "extraordinary" step of holding that the value of remote education is less than the value of in-person education. (Doc. 12 at 1.) In UVM's view, that would require the court to evaluate the quality of the remote education that UVM students received after March 18, 2020, and to pass judgment on educational methods. (*Id.*) According to UVM, the doctrine of deference described above precludes courts from making such inquiries.

The complaint does include allegations that the online learning that UVM provided after March 18, 2020 was not as

---

[2] *See also Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 93-94 (2d Cir. 2011)* (New York does not recognize "educational malpractice" claims because public policy disfavors court interference with educators' professional judgment); *Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206-07 (S.D.N.Y. 1998)* ("Where the essence of the complaint is that the school breached its agreement by failing to provide an effective education, the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for 'educational malpractice.'"); *Reilly v. Sw. Vt. Supervisory Union*, No. 152-4-14 Bncv, 2016 WL 6662421, at *12 (Vt. Super. Ct. Mar. 31, 2016) (recognizing that the "educational malpractice" theory of liability has been rejected in other states); Restatement (Third) of Torts: Physical and Emotional Harm § 7 Reporter's Note, cmt. f (2010) ("In the educational-malpractice area, courts have concluded that educators have no duty of care to their students, often because of the administrative difficulties in adjudicating such claims. Problems exist both in sorting out conduct that is innovative or nontraditional as opposed to negligent and in determining the factual cause of a student's educational deficiency.").

valuable as in-person learning. *(See* Doc. 1 ¶ 31 (alleging that students do not perform as well in an online **[\*13]** setting); *id.* ¶ 32 (alleging that UVM's switch to online learning "stymied and disrupted" Plaintiffs' "learning experiences").) And the relief that Plaintiffs seek similarly draws distinctions between the value of online versus in-person education. *(See id.* ¶ 56 (seeking compensation for "the difference between the value of one half a semester of online learning versus the value of one half a semester of live in-person instruction"); *see also id.* ¶ 74.)

Notwithstanding those allegations, the court concludes that this case differs significantly from an educational-malpractice case. Plaintiffs' claims do not require the court to review "the soundness or effectiveness of a program or method of teaching." *Connors, 2013 U.S. Dist. LEXIS 205432, 2013 WL 12221826, at \*3.* The essence of Plaintiffs' complaint is not that UVM provided an ineffective education or that Plaintiffs failed to learn the subject matter in their courses or earn academic credits. Plaintiffs are not asking the court to enter the classroom (physical or virtual) and review the course outline, course materials, methods of teaching, or evaluate individual students' academic achievement. Indeed, Plaintiffs acknowledge UVM's "efforts to continue delivering their education in some format." **[\*14]** (Doc. 1 ¶ 32.)

Instead, Plaintiffs claim that they "did not get the full benefit of what they bargained for when they paid tuition for the Spring 2020 semester." *(Id.* ¶ 33.) Reading the complaint in the light most favorable to Plaintiffs, they bargained for in-person instruction and studies with classmates, in-person social interaction, access to UVM buildings and amenities, participation in on-campus student activities, and physical proximity to the City of Burlington and to nearby recreational activities. They allege that UVM promised them these important aspects of an undergraduate education in its handbook and other publications. Because it rests upon breach of a promise, Plaintiffs' claim that they did not receive the full benefit of that bargain is different from an educational-malpractice claim.

At this stage, it does not appear that adjudication of Plaintiffs' claim necessarily requires an inquiry into the academic quality of the remote education that Plaintiffs received. Nor do Plaintiffs' claims violate UVM's academic freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 312, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978)* (quoting *Sweezy v. New Hampshire, 354 U.S. 234, 263, 77 S. Ct. 1203, 1 L. Ed. 2d 1311 (1957)* **[\*15]** (Frankfurter, J., concurring)). Courts have no business telling an academic institution that it must employ lectures, seminars, or the

Socratic method to teach a particular subject matter. But a decision to deliver instruction via remote technology is not a decision on "how" the material is taught in the sense that Justice Frankfurter discussed in *Sweezy.* Nor was UVM's decision in this case made "on academic grounds"; it was instead an administrative decision made to address the exigencies of the COVID-19 pandemic.

Other courts analyzing similar COVID-19-related claims against educational institutions for shifts to online learning have similarly rejected requests for dismissal that were based on court deference to academic freedoms. *See, e.g., Ford v. Rensselaer Polytechnic Institute, No. 1:20-CV-470, 2020 U.S. Dist. LEXIS 236692, 2020 WL 7389155, at \*6 (N.D.N.Y. Dec. 16, 2020)* (concluding that "deference to educational institutions cannot reach so far as to deny students any recourse for breaches of express promises" and that plaintiffs' claims were not "educational malpractice" claims because they argued only that "regardless of fault, the value of the on-campus experience defendant plausibly promised them is greater than the value of the remote experience **[\*16]** they received"); *Saroya v. Univ. of the Pac., No. 5:20-cv-03196-EJD, 2020 U.S. Dist. LEXIS 222089, 2020 WL 7013598, at \*3-5 (N.D. Cal. Nov. 27, 2020)* (defendant-university that switched to online learning in response to COVID-19 asserted that plaintiff-students' breach-of-contract and unjust-enrichment tuition claims were fundamentally demands for court intervention in academic decisions and were therefore barred claims for "educational malpractice"; court declined to dismiss claims, reasoning that the claim was not that the university "failed to provide students with an adequate education, but that it failed to provide certain services as promised").[3]

---

[3] *See also Oyoque v. Depaul Univ., No. 20 C 3431, 2021 U.S. Dist. LEXIS 31722, 2021 WL 679231, at \*2 (N.D. Ill. Feb. 21, 2021)* ("Though portions of the plaintiffs' allegations *can* be read as talking about the value of online instruction, at its core the complaint's focus is breach of contract . . . ."); *Hassan v. Fordham Univ., No. 20-CV-3265 (KMW), 2021 U.S. Dist. LEXIS 16541, 2021 WL 29255, at \*3 (S.D.N.Y. Jan. 28, 2021)* ("The Court holds that Plaintiffs claims are not barred by the educational malpractice doctrine, because they are sufficiently grounded in whether an alleged promise for educational services was made and breached."); *Doe v. Emory Univ., No. 1:20-CV-2002-TWT, 2021 U.S. Dist. LEXIS 22800, 2021 WL 358391, at \*4 (N.D. Ga. Jan. 22, 2021)* ("Because judicial intervention here would not require continuous judicial intrusion, and because a court can properly and justly evaluate the dispute, this Court declines the Defendant's invitation to defer to its decision-making without assessing the merits of the Plaintiffs' claims."); *Hiatt v. Brigham Young Univ., No. 1:20-CV-001100-TS, 2021 U.S. Dist. LEXIS 3269, 2021 WL 66298, at \*3 (D. Utah Jan. 7, 2021)* ("Plaintiff is not asking the Court to interfere in BYU's academic or pedagogical

This conclusion distinguishes cases like *Gociman v. Loyola University of Chicago, No. 20 C 3116, 2021 U.S. Dist. LEXIS 13238, 2021 WL 243573, at *3 (N.D. Ill. Jan. 25, 2021)*, and *Lindner v. Occidental College, No. CV 20-8481-JFW(RAOx), 2020 U.S. Dist. LEXIS 235399, 2020 WL 7350212 (C.D. Cal. Dec. 11, 2020)*. The courts in those cases found that the theory underlying all of the plaintiffs' claims was that the quality and value of their online education was less than the value of live classes. *See Gociman, 2021 U.S. Dist. LEXIS 13238, 2021 WL 243573, at *3; Lindner, 2020 U.S. Dist. LEXIS 235399, 2020 WL 7350212, at *7*. This court respectfully declines to follow those cases insofar as they construe the plaintiffs' theories so narrowly.

## B. Unjust-Enrichment Claims

**UVM's** argument requesting dismissal of Plaintiffs' unjust-enrichment tuition claims **[\*17]** is premised on the same academic-freedom considerations. *(See* Doc. 12 at 13.) The court will not dismiss those claims on that basis for the reasons stated above.

## C. Breach-of-Contract Claims—Terms of the Contract

UVM argues that the materials cited in Plaintiffs' complaint—UVM's course catalogue and website—do not create any actionable promises, and that written disclaimers and reservations of rights in those materials preclude Plaintiffs' tuition claims. (Doc. 12 at 19.) Plaintiffs maintain that, under Vermont law, the terms of their contract with UVM are contained in a variety of UVM statements, policies, and publications, and that UVM's "disclaimers" and "reservation of rights" defenses do not affect their claims. (Doc. 24 at 14.) UVM insists that the disclaimers and reservation-of-rights language in official UVM statements and documents defeat Plaintiffs' tuition claims. (Doc. 27 at 4-7.)

---

choices by requiring BYU to provide in-person education or change its methods of instruction. Rather, Plaintiff is asking for a refund of tuition and/or mandatory fees for the breach of contract alleged."); *MGarland v. W. Mich. Univ., No. 20-000063-K, 2020 Mich. Ct. Cl. LEXIS 7, 2020 Mich. Ct. Cl. LEXIS 7, at *9-10 (Mich. Ct. Cl. Sept. 15, 2020)* (university moved for summary disposition of breach-of-contract and unjust-enrichment claims arising out of university's transition to online learning due to COVID-19; court concluded that allowing claims to proceed would not interfere with academic autonomy); *Waitt v. Kent State Univ., No. 202000392JD, 2020 Ohio Misc. LEXIS 143, at *3-4 (Ohio Ct. Cl. Sept. 28, 2020)* (university moved to dismiss breach-of-contract and unjust-enrichment claims arising out of its decision to close buildings and switch to remote learning due to COVID-19; court concluded that the complaint did not present a claim of "educational malpractice").

The court begins with a few general principles:

• the parties do not dispute that Vermont contract law applies. "Between a student and a college there is a relationship which is contractual in nature." *Merrow v. Goldberg, 672 F. Supp. 766, 774 (D. Vt. 1987)*; *see also Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 708 (D. Vt. 2012)* (citing *Reynolds v. Sterling Coll., Inc., 170 Vt. 620, 621, 750 A.2d 1020, 1022 (2000)* (mem.)); *Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 242 (D. Vt. 1994)*.

• "The 'terms of the contract are contained in the brochures, course **[\*18]** offering bulletins, and other official statements, policies and publications of the institution.'" *Reynolds, 170 Vt. at 621, 750 A.2d at 1022* (quoting *Merrow, 672 F. Supp. at 774*).

• Such a contract is commonly described as "implied-in-fact"—a category long recognized in Vermont decisional law. *See Underhill v. Rutland R. Co., 90 Vt. 462, 98 A. 1017, 1021 (1916)* ("Contracts implied in fact are based upon an actual agreement of the parties, deduced by the trier from the conduct of the parties and the circumstances of the case.") *Section 4 of the Restatement (Second) of Contracts* also recognizes that contracts "may be inferred wholly or partly from conduct."

These principles distinguish *Student "A" v. Hogan, No. CCB-20-1434, 2021 U.S. Dist. LEXIS 6947, 2021 WL 119083 (D. Md. Jan. 13, 2021)*, cited by UVM. The plaintiffs in that case elected not to pursue a breach-of-implied contract claim. *2021 U.S. Dist. LEXIS 6947, [WL] at *2*. The court dismissed their breach-of-express-contract claim because the complaint contained nothing more than speculative assertions of a written contract that obligated the defendants to provide "in-person housing, meals, and education in exchange for a specified fee." *2021 U.S. Dist. LEXIS 6947, [WL] at *4*; *see also Doe v. Emory Univ., No. 1:20-CV-2002-TWT, 2021 U.S. Dist. LEXIS 22800, 2021 WL 358391, at *6 (N.D. Ga. Jan. 22, 2021)* (finding insufficient allegations to support breach-of-express-contract claim). In contrast to *Student "A"*, Plaintiffs in this case are proceeding on a breach-of-implied contract claim.

These general principles defeat UVM's argument **[\*19]** that the tuition claims can be dismissed under *Rule 12(b)(6)* because the complaint's reference to portions of the UVM course catalogue and website "do not, on their face, create actionable promises." (Doc. 12 at 10.) It is beyond reasonable dispute that *some* contract exists between UVM and its students. Which terms may reasonably be inferred from conduct, including handbooks and course catalogues, is a

factual issue. But in the limited context of a motion to dismiss, the court is obligated to resolve such inferences in favor of the plaintiffs.

In this case, the complaint alleges that the UVM course catalogue distinguishes between "online" and other types of instruction. (Doc. 1 ¶ 19.) The complaint further alleges that "only a small fraction" of the courses listed in the catalogue are billed as "online." (*Id.* ¶ 18.) And the complaint quotes a statement from the "Campus Life" page on the UVM website touting the advantages of a "bustling campus" located in "one of America's best college towns" with opportunities for "work, service and play." (*Id.* ¶ 20.) Drawing all reasonable inferences in Plaintiffs' favor, a factfinder could conclude that UVM promised its students that their academic courses would [*20] be largely in-person and that they would receive the benefits of on-campus (and adjacent) facilities and activities.

Courts applying similar law in analogous circumstances have reached the same conclusion. *See, e.g., Doe, 2021 U.S. Dist. LEXIS 22800, 2021 WL 358391, at *6* ("Defendant's customary practice and the Plaintiffs' payment of tuition represent sufficient factual allegations of mutual assent to an implied contract."); *Bahrani v. Ne. Univ., No. 20-10946-RGS, 2020 U.S. Dist. LEXIS 244482, 2020 WL 7774292, at *2 (D. Mass. Dec. 30, 2020)* (holding that further factual development was needed to determine whether plaintiffs had a contractual right to in-person instruction); *Ford, 2020 U.S. Dist. LEXIS 236692, 2020 WL 7389155, at *4* (university's statements in its "Plan"—including commitment to offer a "complete student experience" and benefits from a "residential setting"—was a "specific promise," at least for *Rule 12(c)* purposes); *Gibson v. Lynn Univ., Inc., No. 20-CIV-81173-RAR, 2020 U.S. Dist. LEXIS 222214, 2020 WL 7024463, at *3 (S.D. Fla. Nov. 29, 2020)* (rejecting university's argument that complaint lacked allegations of contractual provisions requiring university to provide in-person education or requiring a refund of fees; reasoning that "[t]hroughout the Amended Complaint, Plaintiff cites to portions of Lynn's publications and policies that suggest courses would be conducted in-person and students would have access to campus facilities and activities"); *Saroya, 2020 U.S. Dist. LEXIS 222089, 2020 WL 7013598, at *5* [*21] (allegations of statements in university's course catalogue were sufficient to state a claim for breach of an implied-in-fact contract to deliver courses in-person); *Rosado v. Barry Univ. Inc., No. 1:20-CV-21813-JEM, 2020 U.S. Dist. LEXIS 204355, 2020 WL 6438684, at *3 (S.D. Fla. Oct. 30, 2020)* (allegations of university documents referring to in-person classes and amenities were sufficient to establish implied contract for in-person instruction); *Salerno v. Fla. S. Coll., No. 8:20-cv-1494-30SPF, 2020 U.S. Dist. LEXIS 215349,*

*2020 WL 5583522, at *5 (M.D. Fla. Sept. 16, 2020)* (college publications "clearly implied that courses would be conducted in-person" and touted college's on-campus "resources and facilities"; such statements were sufficient to establish an implied contract).

The cases upon which UVM relies do not compel a contrary conclusion. In *Horrigan v. Eastern Michigan University, No. 20-000075-MK, 2020 Mich. Ct. Cl. LEXIS 9, 2020 WL 6050534 (Mich. Ct. Cl. Sept. 24, 2020),* after the university transitioned to online classes due to the COVID-19 pandemic, student Kevin Horrigan filed a six-count complaint on breach-of-contract and unjust-enrichment theories with respect to payments for tuition, room, and board. He claimed that he had an "express agreement" with the university under which the university agreed to provide live, in-person instruction. *2020 Mich. Ct. Cl. LEXIS 9, [WL] at *1.* The court granted the university's motion for summary disposition for failure to state a claim. On the tuition claim, the court reviewed the written "Tuition Agreement"—which promised "educational services" but did not contain promises about the method of instruction—and [*22] concluded that the plaintiff had failed to plead "which service(s) were not received." *2020 Mich. Ct. Cl. LEXIS 9, [WL] at *4. Horrigan* is distinguishable because the plaintiff in that case relied on an alleged express agreement—presumably the Tuition Agreement. As discussed above, Plaintiffs in this case rely on Vermont law to argue that the terms of the contract appear in a variety of UVM's statements and give rise to an implied contract.

*Chong v. Northeastern University, No. 20-10844-RGS, 2020 U.S. Dist. LEXIS 181622, 2020 WL 5847626 (D. Mass. Oct. 1, 2020),* is similarly distinguishable. Students in that putative class action case alleged breach of contract and unjust enrichment after Northeastern University retained tuition and fees for spring semester 2020 despite transitioning to online learning in March 2020 due to the COVID-19 pandemic. The plaintiffs argued that their agreement with the university appeared in the written "Financial Responsibility Agreement" (FRA) and that the university breached that agreement when it ceased providing in-person instruction. *2020 U.S. Dist. LEXIS 181622, [WL] at *2.* The court dismissed the breach-of-contract tuition claim, reasoning that the FRA "ties the payment of tuition to registration for courses, not to the receipt of any particular method of instruction." *2020 U.S. Dist. LEXIS 181622, [WL] at *3.* The court rejected [*23] the plaintiffs' attempt to refer to a "semester schedule" to establish contract terms because the plaintiffs had failed to include that allegation in the operative pleading. *Id.* In contrast, Plaintiffs in this case *have* included allegations of university materials that could plausibly establish a contract to provide in-person instruction. *See Ford, 2020 U.S. Dist. LEXIS 236692, 2020 WL 7389155, at *5* (similarly

distinguishing *Chong*).

On this issue, *Oyoque, Hassan* and *Lindner*—cited by UVM—are therefore also distinguishable. The court in *Lindner* determined that the plaintiffs "failed to identify any specific language in the 2019-2020 Catalog or any other publication from Occidental that promises in-person instruction." *2021 U.S. Dist. LEXIS 31722, [WL] at *8*. Finding *Lindner* persuasive, the *Hassan* court similarly held that "Fordham's alleged statements do not rise to the level of a specific promise to provide in-person educational services." *Hassan, 2021 U.S. Dist. LEXIS 16541, 2021 WL 293255, at *6*. And the *Oyoque* court held that "none of the facts alleged by the plaintiffs amounts to a concrete contractual promise to provide in-person educational services, experiences, or opportunities." *Oyoque, 2021 U.S. Dist. LEXIS 31722, 2021 WL 679231, at *5*. As discussed above, the court concludes that Plaintiffs in this case have identified UVM materials that could plausibly establish a contract for in-person [*24] instruction.

UVM notes that "[n]ot all terms in a student handbook are enforceable contractual obligations" and that "courts will only enforce terms that are 'specific and concrete.' *Knelman, 898 F. Supp. 2d at 709* (quoting *Reynolds, 170 Vt. at 621, 750 A.2d at 1022*). Thus "[l]anguage in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable." *Id.* The court agrees with UVM that some of the statements on UVM's "Campus Life" website are not enforceable "specific and concrete" terms. Plaintiffs cannot enforce statements that UVM's community is comprised of "thinkers and doers" or that the university is "balanced in mind, body and spirit." But the other statements in the course catalogue and on the website could reasonably be interpreted by a fact finder to form a promise that Plaintiffs' academic courses would be in-person and that Plaintiffs would receive the benefits of on-campus (and adjacent) facilities and activities.

UVM contends that there is additional language in the course catalogue and on the UVM website—language not recited in the complaint—that gave UVM the right to modify how it offered courses to students. *(See [*25]* Doc. 12 at 9.) That argument leads directly to the parties' disputes over the scope of materials that the court may consider under *Rule 12(b)(6)*. The court addresses those issues in the context of its review of the specific materials upon which UVM relies.

## 1. Reservation of Rights in the Course Catalogue

Plaintiffs' complaint explicitly refers to UVM's course catalogue and asserts that the catalogue "clearly indicates what a student is contracting for when he or she signs up for a course." (Doc. 1 ¶ 19.) Although the course catalogue is not attached as an exhibit to the complaint, the court concludes that it is integral to the complaint and may properly be considered under *Rule 12(b)(6)*. *See Libertarian Party of Erie Cnty. v. Cuomo, 970 F.3d 106, 120 (2d Cir. 2020)* ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim." (second and third alterations in original; quoting *Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991))).* Plaintiffs concede that the complaint refers to statements in the course catalogue. (Doc. 24 at 8 n.2.)

UVM relies on the following statement in the 2019-2020 UVM Undergraduate Catalogue: "The University [*26] of Vermont reserves the right to make changes in the course offerings, degree requirements, charges, regulations, and procedures contained herein as educational and financial considerations require, subject to and consistent with established procedures and authorizations for making such changes." (Doc. 13-5 at 10.) According to UVM, this express reservation of rights defeats Plaintiffs' contention that there was an enforceable contract for in-person instruction. *(See* Doc. 12 at 9.)

Plaintiffs argue that, under *Reynolds*, once they began paying tuition, UVM was "no longer able to unilaterally change the terms of the deal without paying additional consideration." (Doc. 24 at 15.) Plaintiffs further assert that the right that UVM reserved is by its own terms a limited right to make changes required by "educational and financial considerations" and that neither of those types of considerations applies in this case. (*Id.* at 16.) Finally, Plaintiffs argue that the right reserved by UVM is "subject to and consistent with established procedures and authorizations for making such changes," and that the relevant procedures and authorizations cannot be proven in the present procedural context. (*Id.*)

### a. Reynolds [*27]

In *Reynolds*, Sterling College's tuition refund policy appeared in the college's catalogue covering 1994-1996, but included a footnote stating that "At press time, the Tuition Refund policy is under revision to comply with the requirements of the federal Higher Education Amendments of 1992. Please consult the refund policy accompanying all tuition bills or request a copy of the policy in effect during your attendance."

*Reynolds, 170 Vt. at 620, 750 A.2d at 1021*. Sterling College student Jay Reynolds voluntary withdrew on January 5, 1996, at which time his mother Betty Reynolds had already paid the college $14,104 out of a total comprehensive fee of $18,167 for the year. Under a new refund policy—a copy of which was delivered to Jay on September 25, 1995—the refund would have been $379. It was undisputed that the refund would have been much larger under the tuition refund policy that appeared in the catalogue. *Id. at 621, 750 A.2d at 1021-22*.

Betty and Jay Reynolds filed suit to obtain a partial refund "under the policy in effect at the time they commenced paying tuition." *Id. at 620, 750 A.2d at 1021*. The Superior Court dismissed Plaintiffs' breach-of-contract and consumer-fraud claims, reasoning that the college "had validly reserved the right to modify its tuition reimbursement policy **[*28]** and had done so." *Id.* The Supreme Court reversed, holding that the contract between the parties gave plaintiffs "the tuition refund rights provided in the catalog once they commenced paying tuition." *Id. at 622, 750 A.2d at 1023*. The Supreme Court also concluded "that a unilateral modification, going to a specific and definite term like the amount of tuition to be paid, must be supported by consideration." *Id.*

UVM maintains that *Reynolds* does not go so far as to bar universities "from making any modifications to the academic experience after students have paid tuition." (Doc. 27 at 5.) And UVM argues that *Reynolds* is distinguishable because "the language UVM relies upon was in the Course Catalog at the outset and not the product of any unilateral modification." *(Id.)* It is true that, unlike *Reynolds*, there is no indication that at any relevant time UVM was contemplating alteration or did alter the reservation-of-right language in the course catalogue. But Plaintiffs are not alleging any unilateral modification of *that* language; they claim that UVM cannot rely on that language to unilaterally modify an implied term in the contract that students would receive in-person education and experiences.

Both parties recognize **[*29]** that a contract term which places unilateral authority in one party to alter the terms of the contract may render the contract unenforceable. *(See* Doc. 12 at 9; Doc. 24 at 14-18.) Such a provision is frequently identified as illusory. *See Restatement (Second) of Contracts § 77 cmt. a.* ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."). A promise to provide in-person education, subject to the right to change it without consent of the student, might well qualify as an illusory promise, rendering the contract unenforceable for lack of consideration.

But as we have seen, it is too late in the day to argue that these parties have no contract. They have already created an implied contract through their actions and both—students and university alike—have performed at least in part. In the case of the students, performance has included full payment of tuition for the semester. The court cannot declare the contract to be unenforceable just because UVM included language reserving the right to change its performance in the future. This was precisely the type of one-sided discretion which the Vermont Supreme Court chose not to enforce in *Reynolds*. The court will not **[*30]** enforce UVM's reservation of the right to change its educational program to render the contract unenforceable. The court accordingly finds *Lindner* unpersuasive insofar as the court in that case held that a reservation of rights in the college's course catalog to change fees or modify services defeated the breach-of-implied-contract claim. *Lindner, 2020 U.S. Dist. LEXIS 235399, 2020 WL 7350212, at *9*.

Notably, the reservation of rights is limited in some respects. It is not a reservation of a right to change any aspect of the bargain. It reserves only the right to "make changes in the course offerings, degree requirements, charges, regulations, and procedures contained herein"—i.e., those terms as contained in the course catalogue. (Doc. 13-5 at 10.) And according to Plaintiffs' complaint, the alleged term in the implied-in-fact contract for in-person instruction derives not solely from statements in the course catalogue, but also from statements on UVM's website. If that is true, then the reservation of rights could not include a reservation of a right to alter a term that is derived (at least in part) from outside the course catalogue. *See Hiatt, 2021 U.S. Dist. LEXIS 3269, 2021 WL 66298, at *3* ("Here, there is insufficient information for the Court to determine whether this disclaimer bars Plaintiffs **[*31]** claim as a matter of law.").

The court's conclusion, therefore, does not mean that educational institutions, or UVM in particular, can make no changes to any aspect of the academic experience after students have begun paying tuition. The court is not holding that UVM would be liable for breach of contract if, for example, due to low enrollment a class listed as a lecture was changed to a seminar, or if due to illness, the listed instructor for a class was replaced with a substitute, or if a campus building is closed due to renovations. And, at the stage of the motion to dismiss, the court is not ruling that UVM has breached the contract in place at the beginning of the semester. The "reservation of rights" language may be admissible as some evidence that the implied contract in place at the start of the semester included authority to adjust the manner of instruction. The court is ruling only that the terms of the implied contract, including discretion to change and adjust to unexpected circumstances, is a fact-bound determination which cannot be determined as a matter of law

through dismissal of the complaint.

### b. "Educational and Financial Considerations"

Even if *Reynolds* did not defeat [*32] UVM's argument about the reservation-of-rights language in the catalogue, the court concludes that, giving all reasonable inferences to Plaintiffs, the language itself does not necessarily authorize a change to all-remote education. UVM insists that its decision to switch to online instruction was an "educational consideration." (Doc. 27 at 5.) But the court has already concluded that UVM's decision to switch to online learning in spring 2020 was not made on academic grounds but was instead an administrative decision made to address the exigencies of the COVID-19 pandemic. It is unlikely that the "change" to online classes could be said to have been required by "educational" considerations. UVM remains free, of course, to seek to prove at trial that the change to remote learning was "educational" in nature.

### c. "Established Procedures and Authorizations"

The court agrees with Plaintiffs that in ruling on a motion to dismiss, the court cannot rule on the basis of the pleadings that the "change" was consistent with "established procedures and authorizations," since those procedures and authorizations are not listed in or integral to the complaint and do not appear to be proper subjects [*33] for judicial notice.

### 2. Disclaimers on the UVM Website

At the bottom of the "Campus Life" webpage cited in the complaint is a hyperlink to UVM's "Privacy/Terms of Use" policy. *Campus Life*, https://www.uvm.edu/campus_life (last visited Mar. 15, 2021). That hyperlink leads to a webpage listing UVM's website privacy policy and terms of use. *Website Privacy Policy/Terms of Use*, https://www.uvm.edu/compliance/website-privacy-policy/terms-use (last visited Mar. 15, 2021). UVM relies on the following language appearing in the "terms of use" section of that webpage: "This Site is provided as is and as available, without any warranties of any kind, either express or implied. . . . UVM does not represent or warrant that the Site or its content will be accurate, reliable, error-free, or uninterrupted . . . ." *Id.* According to UVM, that language "expressly disclaims all warranties and intent to create a contract." (Doc. 12 at 9.)

The parties disagree over whether the court can properly consider the quoted language under *Rule 12(b)(6)*. Plaintiffs contend that their complaint does not refer to the "terms of use" webpage and that they did not rely on it when they were drafting the complaint. They further assert [*34] that there is no indication in the complaint that the webpage might have been incorporated into the parties' contract. (Doc. 24 at 7-8.) And they suggest that the document has not been "authenticated," that the information it contains is not generally known, and that it is "reasonably capable of being questioned." (*Id.* at 7.) UVM maintains that, since the complaint relies on and quotes the UVM website, the "terms of use" webpage may properly be considered. *(See* Doc. 12 at 4 n.3.)

The court concludes that it is irrelevant whether Plaintiffs relied on the "terms of use" webpage when drafting the complaint. Since the webpage is a publicly available UVM policy statement, the court may take notice of it. *See Force v. Facebook, Inc., 934 F.3d 53, 59 n.5 (2d Cir. 2019)* (since their authenticity was not in question, Facebook's publicly-available terms of service were subject to judicial notice); *Nicosia v. Amazon.com, Inc., 834 F.3d 220, 234 (2d Cir. 2016)* (Amazon.com "Order Page" and "2012 Conditions of Use," although not attached to the complaint, were "part of the contract incorporated into the complaint by reference"); *Lowell v. Lyft, Inc., 352 F. Supp. 3d 248, 263 n.5 (S.D.N.Y. 2018)* ("Courts may take judicial notice of public[ly] available websites when the authenticity is not in dispute."). Plaintiffs do not elaborate on their assertion that UVM's "terms of use" webpage has [*35] not been authenticated, the information therein is "not generally known," and that it is "reasonably capable of being questioned." (Doc. 24 at 7.) The court need not address such "boilerplate" evidentiary objections. *See Granlund v. Burbank Hill Cmty. Ass 'n, No. SACV 19-01439JVS(KESx), 2020 U.S. Dist. LEXIS 167921, 2020 WL 5498075, at *4 (C.D. Cal. Aug. 5, 2020)* (additionally noting that "[c]ourts have found it proper to take judicial notice of a party's own website pursuant to *Fed. R. Evid. 201*").

Apart from their argument that the court should not even consider the "terms of use" webpage, Plaintiffs advance two arguments for their position that the disclaimers on that page do not aid UVM. First, they assert that, notwithstanding the disclaimers, the statements on the "Campus Life" webpage "were published by Defendant, and therefore, are considered part of its contract with Plaintiffs as a matter of law" under *Reynolds* and other cases. (Doc. 24 at 17.) Second, Plaintiffs argue that the disclaimers on the "terms of use" webpage are unenforceable "browsewrap" agreements. *(See id.* at 17-18.)

In contrast to "clickwraps"—which typically require users to click an "I agree" box after being presented with a list of terms or conditions of use—"browsewrap" agreements "involve terms and conditions posted [*36] via hyperlink,

commonly at the bottom of the screen, and do not request an express manifestation of assent." *Nicosia, 834 F.3d at 233.* "In determining the validity of browsewrap agreements, courts often consider whether a website user has actual or constructive notice of the conditions." *Id.* "Whether there was notice of the existence of additional contract terms presented on a webpage depends heavily on whether the design and content of that webpage rendered the existence of terms reasonably conspicuous." *Id.*

The court concludes that is unnecessary to perform that "reasonably conspicuous" inquiry. The quoted language cannot bar consideration of the statements on the "campus life" webpage in determining the terms of the parties' contract. All of the statements on the "terms of use" webpage that UVM quotes—that the UVM website is provided "as is and as available," the disclaimer of "warranties of any kind," and the statement that "UVM does not represent or warrant that the Site or its content will be accurate, reliable, error-free, or uninterrupted"—relate to the performance or functionality of the website, not the *legal effect* that statements on the website may have on the terms of the contract between UVM **[\*37]** and UVM students.

For all of the above reasons, the court concludes that UVM has failed to show any basis for dismissal of Plaintiffs' breach-of-contract and unjust-enrichment claims for tuition refunds.

## III. Housing and Meal Claims

Plaintiffs seek refunds of sums they paid for housing (Counts II and V) and meals (portions of Counts III and VI) on breach-of-contract and unjust-enrichment theories. UVM argues that those claims should be dismissed because of exculpatory provisions and reservations-of-rights in the Housing and Meal Plan Contract. Plaintiffs do not dispute that the complaint refers to statements in the Housing and Meal Plan Contract. (*See* Doc. 24 at 8 n.2.) The court proceeds to examine the language upon which UVM relies, beginning with the "Emergency Closing" provision referenced in the complaint. (Doc. 1 ¶ 26-27.)

As noted above, the "Emergency Closing" provision in the Housing and Meal Plan Contract states:

> In the event that the University of Vermont closes due to a calamity or catastrophe beyond its control that would make continued operation of student housing infeasible, such as a natural disaster, a national security threat, or widespread pandemic flu, room and meal **[\*38]** plan fees will not be refunded.

(*Id.* ¶ 27.) In opposition to Plaintiffs' assertion that UVM "has not closed" (Doc. 1 ¶ 27) and that the "Emergency Closing" provision does not apply, UVM maintains that the provision refers to UVM's physical campus and that UVM "did in fact effectively close." (Doc. 12 at 15.) In support of the latter proposition, UVM points to instances in the complaint itself where Plaintiffs allege that UVM "was effectively closed" (Doc. 1 ¶ 36) and that "most UVM buildings were closed" (*id.* ¶ 39). In support of the former proposition, UVM argues that the "Emergency Closing" provision's language necessarily refers to closure of the physical campus because that provision appears in the context of a contract for housing and dining facilities—i.e., physical facilities.

The goal of courts interpreting contracts governed by Vermont law is "to effectuate the parties' intent as expressed in their writing, according, whenever possible, to the plain meaning of the contract language." *Besaw, Trustee of Revocable Living Trust of Ernest P. Giroux v. Giroux, 2018 VT 138, ¶ 21, 209 Vt. 388, 205 A.3d 518.* The court endeavors to 'form a harmonious whole from the parts,' recognizing that 'an interpretation which harmonizes all parts of the contract is preferable to an interpretation which focuses **[\*39]** on one provision heedless of context.'" *Id.* ¶ 27 (quoting *In re Verderber, 173 Vt. 612, 615, 795 A.2d 1157, 1161-62 (2002)* (mem.)). Only if the language is ambiguous—"meaning that reasonable people could understand it differently"—does the court look beyond the four corners of the writing to understand its meaning. *Sutton v. Vt. Reg'l Ctr., 2019 VT 71A, ¶ 66, 238 A.3d 608.*

Because Plaintiffs concede that the complaint expressly refers to statements in the Housing and Meal Plan Contract (Doc. 24 at 8 n.2), the court has reviewed the full text of the contract that appears in the record at Document 13-6. The Housing and Meal Plan Contract does not include any separate "definitions" section defining "closure" for purposes of the "Emergency Closing" provision. And the provision's reference to "the University of Vermont" closing is not a model of clarity—read in isolation, that phrase might suggest closure of the entire campus and all university functions and operations.

But when read in context of the full "Emergency Closing" provision, the court concludes that "closure" unambiguously refers to closure of the facilities necessary to provide student housing and meals. The subsequent text specifies that the "closure" must be "due to a calamity or catastrophe beyond [UVM's] control that would make continued operation **[\*40]** of student housing infeasible, such as . . . widespread pandemic flu." (Doc. 1 ¶ 27.) In addition, this provision appears in a contract that pertains to housing and meals; that fact provides further support for the conclusion that the

relevant "closure" is closure of UVM's housing and food-service facilities.

This conclusion makes it unnecessary to consider or review the other provisions that UVM has cited. UVM is entitled to dismissal of Plaintiffs' breach-of-contract claims for room and meal plan fees because the "Emergency Closing" provision in the parties' contract unambiguously specifies that such fees will not be refunded in the circumstances that are present here. As part of an express contract on the subject matter, the "Emergency Closing" provision is "highly relevant in determining whether denying further payment . . . is unjust." *Kwon v. Edson, 210 Vt. 557, 2019 VT 59, ¶ 57, 217 A.3d 935* (alteration in original) (quoting *DJ Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 243, 776 A.2d 413, 417 (2001))*. The court concludes that this contractual language specifically allocated the risk of loss due to widespread pandemic flu, and therefore denying further payment (or refund) of these costs is not unjust. UVM is therefore also entitled to dismissal of Plaintiffs' unjust-enrichment claims for room and meal plan fees. **[*41]**

**IV. Fee Claims**

Finally, Plaintiffs allege that UVM "failed to offer students a refund of any of the fees they paid for the semester that were unused or for which they had not received a benefit." (Doc. 1 ¶ 37.) According to Plaintiffs, examples of such fees are "the comprehensive fees and parking fees." *(Id. ¶ 38.)* Plaintiffs seek compensation for the fees paid on breach-of-contract and unjust-enrichment theories (portions of Counts III and VI).

UVM argues that Plaintiffs have failed to state a plausible claim for refund of either a "parking" fee or a "comprehensive" fee. (Doc. 12 at 17.) As to the parking fee, UVM asserts that Plaintiffs have alleged only that "students" paid such fees without receiving a refund, but that the named plaintiffs, Nilay Patel and Rachel Gladstone, have not alleged that they are among that group of students. Regarding the comprehensive fee, UVM maintains that it continued to provide instruction and course credit in the second half of the spring 2020 semester, and that Plaintiffs have not alleged that UVM charges a different comprehensive fee depending on whether students are enrolled in online or in-person classes. *(Id.* at 17-18.)

**A. Parking Fees**

In their opposition brief, **[*42]** Plaintiffs assert that they "did, in fact, make [the] allegation" that they paid parking fees for the spring 2020 semester. (Doc. 24 at 26.) UVM encourages

the court to refer to correspondence between the parties in the weeks after Plaintiffs' opposition brief related to the issue of parking fees. *(See* Doc. 28.) The court declines that invitation and confines itself to reviewing the allegations in the complaint. The court proceeds to consider UVM's argument that the complaint lacks allegations that Nilay Patel and Rachel Gladstone personally paid any parking fees, and that the absence of such allegations defeats their claim under Vermont law and any claim they might have to standing as class representatives. *(See* Doc. 27 at 10.)

In the court's view, it is unclear from the text of the complaint alone whether Nilay Patel and Rachel Gladstone paid parking fees for the spring 2020 semester. Since UVM's argument depends on its reading of the complaint as lacking allegations that they paid such fees, the court concludes that it is preferable to get clarification before delving into the legal issues that UVM raises. The court accordingly directs Plaintiffs to provide a more definite statement **[*43]** within 10 days as to their parking-fee claims that specifically indicates whether Nilay Patel and Rachel Gladstone (or anyone on their behalf) paid parking fees for UVM's spring 2020 semester. *See Straker v. Metropolitan Transit Auth., 333 F. Supp. 2d 91, 103 (E.D.N.Y. 2004)* (court may order more definite statement under *Fed. R. Civ. P. 12(e)* on its own initiative).

**B. Comprehensive Fee**

UVM argues that Plaintiffs' comprehensive-fee claim is not plausible for two reasons. First, UVM asserts that the complaint does not allege that UVM stopped providing instruction or course credit and does not include any allegation as to whether UVM charges a different comprehensive fee depending on whether students are enrolled in online or in-person classes. *(See* Doc. 12 at 17.) Second, UVM asserts that the court should consider UVM's "Refund and Bill Adjustment Policy," which according to UVM provides for no refunds after more than 14 days following the semester add/drop deadline. (Doc. 12 at 18; *see also* Doc. 13-7 (copy of purported policy).)

The court rejects UVM's contention in its reply that Plaintiffs have waived their comprehensive-fee claims by failing to respond to UVM's arguments on that issue. *(See* Doc. 27 at 9.) In their opposition brief, Plaintiffs object to the court's consideration **[*44]** of the "Refund and Bill Adjustment Policy" in the *Rule 12(b)(6)* context; they suggest that the policy has "not been authenticated"; that the policy "is not generally known"; and that the source is "reasonably capable of being questioned." (Doc. 24 at 7.) And Plaintiffs insist that they have stated plausible claims for refund of the

comprehensive fee (or a portion of it) because "most UVM buildings were closed, and all student activities were canceled for the remainder of the Spring 2020 semester." (*Id.* at 26.)

The court concludes that it may properly take notice of the UVM "Refund and Bill Adjustment Policy" for the same reasons that it may properly take notice of UVM's "terms of use" webpage. *See supra*. The policy sets a schedule for refund of the comprehensive fee in cases where a student cancels or withdraws from UVM, is suspended, or dismissed. (Doc. 13-7 at 2.) Plaintiffs do not allege that any of those circumstances are present here. No other provision in the "Refund and Bill Adjustment Policy" indicates that a refund might be available save for the following:

Emergency Provisions

The University of Vermont[] reserves the right, in the case of natural disaster, pandemic flu or other acts of God, where **[*45]** the University must cease operation for a single semester or significant portion of a semester, to modify this existing policy. The modified refund policy would be determined by the University administration and by the Board of Trustees.

(*Id.* at 4.) Here, even assuming that UVM "cease[d] operation" under that provision, the complaint includes no allegations that the comprehensive fee refund policy was modified. Presumably if it had been in Plaintiffs' favor, Plaintiffs would not be bringing the comprehensive-fee claim. Absent such modification, the court concludes that the "Refund and Bill Adjustment Policy"—like the Housing and Meal Plan Contract—is integral to the parties' contract and unambiguously specifies that the comprehensive fee will not be refunded in the circumstances that are present here. The court similarly concludes that this provision allocated the risk of loss due to widespread pandemic flu, and denying a refund of the comprehensive fee is not unjust. UVM is entitled to dismissal of Plaintiffs' breach-of-contract and unjust-enrichment claims for the comprehensive fee.[4]

**Conclusion**

UVM's Motion to Dismiss (Doc. 11) is GRANTED IN PART, DENIED IN PART, and RESERVED IN PART. **[*46]** UVM has failed to show any basis for dismissal of Plaintiffs' breach-of-contract and unjust-enrichment claims for tuition refunds (Counts I and IV). UVM is entitled to dismissal of

Plaintiffs' breach-of-contract and unjust-enrichment claims for housing (Counts II and V) and meal plan refunds (the portions of Counts III and VI concerning amounts paid for meals). UVM is also entitled to dismissal of the portions of Counts III and VI that concern the comprehensive fee. The court reserves ruling on the portions of Counts III and VI that concern parking fees, and directs Plaintiffs to provide a more definite statement within 10 days as to those claims that specifically indicates whether Nilay Patel and Rachel Gladstone ( or anyone on their behalf) paid parking fees for UVM's spring 2020 semester.

Dated at Burlington, in the District of Vermont, this 15th day of March, 2021

/s/ Geoffrey W. Crawford

Geoffrey W. Crawford

United States District Court

_____

End of Document

---

[4] The policy also has potential application to tuition refund claims. This issue was not addressed by the parties.

## **EXHIBIT B**

*Barry v. Univ. of Washington*,
Case No. 20-2-13924-6-SEA,
Memorandum and Order (Wn. Super. Ct.
Mar. 18, 2021)

1          HONORABLE JUDITH H. RAMSEYER

2

3

4

5

6

7 **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY**

8

9

10 ALEXANDER BARRY, individually and          No. 20-2-13924-6-SEA
on behalf of all others similarly situated,

11                                           [~~PROPOSED~~] **ORDER GRANTING IN
                                            PART AND DENYING IN PART**
           Plaintiff,                        **DEFENDANTS' MOTION TO DISMISS
12                                           PLAINTIFF'S FIRST AMENDED
                                            CLASS ACTION COMPLAINT FOR**
13    v.                                     **DAMAGES**

14 UNIVERSITY OF WASHINGTON,
WILLIAM S. AYER, JOEL BENOLIEL,
15 JOANNE HARRELL, JEREMY JAECH,
LIBBY MACPHEE, CONSTANCE RICE,
16 ROGELIO RIOJAS, BLANE TAMAKI,
DAVID ZEEK, and, ANA MARI CAUCE,
17
           Defendants.
18

19

20          THIS MATTER having come before the Court on Defendants' Motion to Dismiss

21 Plaintiff's First Amended Complaint (the "Motion"), following the Court's review of Plaintiff's

22 First Amended Class Action Complaint, the parties' briefing and related submissions on

23 Defendants' Motion to Dismiss, and having heard oral argument during the video motion to

24 dismiss hearing held before the Court on March 17, 2021, for the reasons stated by the Court on

25 the record during the March 17, 2021 hearing, *incorporated herein,* Defendants' motion is GRANTED IN PART and

26 DENIED IN PART.

27          The Court DENIES Defendants' Motion to Dismiss with respect to Count I (Breach of

28 Contract), Count II (Breach of Implied Contract) and Count III (Unjust Enrichment).

                                            1

1    The Court GRANTS Defendants' Motion to Dismiss as to Count IV (Violation of the

2    Takings Clause – 42 U.S.C. § 1983), Count V (Inverse Condemnation), and Count VI (Due

3    Process – 42 U.S.C. § 1983).

4    By agreement of the parties, Defendant University of Washington shall answer Plaintiff's

5    First Amended Class Action Complaint on or before **April 21, 2021**. All claims against the

6    individual Defendants have been dismissed.

7    DONE this _____ day of March, 2021.

8

9    HONORABLE JUDITH H. RAMSEYER
     KING COUNTY SUPERIOR COURT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# **EXHIBIT C**

*Gibson v. Lynn Univ., Inc.*,
Case No. 20-CIV-81173-RAR, 2021
U.S. Dist. LEXIS 54324 (S.D. Fla.
Mar. 23, 2021)

No *Shepard's* Signal™
As of: March 24, 2021 4:18 PM Z

## *Gibson v. Lynn Univ.*

United States District Court for the Southern District of Florida

March 23, 2021, Decided; March 23, 2021, Entered on Docket

CASE NO. 20-CIV-81173-RAR

**Reporter**
2021 U.S. Dist. LEXIS 54324 *

RAYMOND GIBSON, individually, and on behalf of all others similarly situated, Plaintiff, v. LYNN UNIVERSITY, INC., Defendant.

DISTRICT JUDGE.

**Opinion by:** RODOLFO A. RUIZ II

## Core Terms

allegations, in-person, class certification, class member, pleadings, unjust enrichment, individualized, class action, Undergraduate, damages, tuition, commonality, contractual, campus, motion to dismiss, proposed class, predominate, discovery, quotation, argues, class action allegations, contends, enroll, class-wide, parties, terms

**Counsel:**  [*1] For Raymond Gibson, individually, and on behalf of all others similarly situated, Plaintiff: Brenton Jeremy Goodman, LEAD ATTORNEY, Levin, Papantonio, Thomas, Mitchell, Echsner, Proctor PA, Pensacola, FL; Matthew David Schultz, LEAD ATTORNEY, Levin Papantonio Thomas Mitchell Echsner & Procter, Pensacola, FL; Rebecca K. Timmons, LEAD ATTORNEY, Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A, Pensacola, FL; Patrick F. Madden, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA.

For Lynn University, Inc., Defendant: Allison Gluvna Folk, LEAD ATTORNEY, Jackson Lewis P.C., Miami, FL; Leslie Lagomasino Baum, LEAD ATTORNEY, Jackson Lewis P.C., Miami, FL; Stephanie Leigh Adler-Paindiris, LEAD ATTORNEY, Jackson Lewis, Orlando, FL; Mendy Halberstam, Jackson Lewis P.C., Miami, FL.

**Judges:** RODOLFO A. RUIZ II, UNITED STATES

## Opinion

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND/OR STRIKE CLASS ACTION ALLEGATIONS

**THIS CAUSE** comes before the Court upon Defendant's Motion to Dismiss and/or Strike Plaintiff's Class Action Allegations [ECF No. 49] ("Motion"), filed on December 28, 2020. The Court having reviewed the Motion, Plaintiff's Response [ECF No. 50], Defendant's **[*2]** Reply [ECF No. 53], and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss and/or Strike Plaintiff's Class Action Allegations [ECF No. 49] is **DENIED** as set forth herein.

### BACKGROUND

Plaintiff Raymond Gibson, an undergraduate student at Lynn University ("Lynn"), contends that he and similarly situated students contracted with Lynn for "live on-campus instruction and access to campus facilities," and were deprived of the benefit of their bargain when Lynn closed its facilities and moved its courses online due to the COVID-19 pandemic. *See* Second Am. Compl. [ECF No. 46] ¶¶ 1, 3. Plaintiff alleges that Lynn's relationship with its students "is based on the terms and conditions set forth inter alia, in Lynn's Academic Catalog, in its University Policies, and its invoices, and is informed by

Lynn's common course of conduct and procedures." *Id.* ¶ 15. He indicates that Lynn offers students the opportunity to enroll in one of three divisions—the Undergraduate Day Division, the Online Division, and the Graduate Division—and that when students enroll in the Undergraduate Day Division, which costs more per credit than the Online Division, they are specifically **[*3]** contracting with the university to provide in-person instruction and access to campus facilities and activities. *Id.* ¶¶ 16-22.

Plaintiff contends that Lynn's promises are set forth in a variety of university publications and documents. For example, for students who enroll in the Undergraduate Day Division, Lynn's University Policies expressly state that "[t]he University believes that ... the classroom experience is the most important part of the student's educational experience." *Id.* ¶ 30. Lynn's Academic Catalog also indicates that "[t]he student's involvement in classroom activities and discussions is encouraged and expected ... [t]herefore, attendance is not only important, but essential to the learning experience." *Id.* ¶ 31. Plaintiff alleges that the Academic Catalog "boasts a rich and lively on-campus student experience," including social activities, intramural sports, and a fitness center. *Id.* ¶ 37. He also asserts that the tuition and fees reflected in his invoice for the Spring 2020 term clearly reflect enrollment in the University's Undergraduate Day Division. *Id.* ¶ 47. Plaintiff contends that he and similarly situated students are entitled to "the prorated portion of tuition **[*4]** and fees necessary to compensate them for the difference in value between what they bargained and paid for and what they received." *Id.* ¶ 119.

On August 31, 2020, Lynn moved to dismiss Plaintiff's First Amended Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*, arguing that Plaintiff fails to allege any contractual provisions requiring Defendant to provide exclusively in-person education or requiring a refund of fees. *See* Mot. to Dismiss First Am. Compl. [ECF No. 15] at 6-12. Lynn further argued that Plaintiff fails to allege a material breach and non-speculative damages; that Plaintiff ratified any alleged breach; and that impossibility and/or frustration of purpose bar Plaintiff's breach of contract claim. *Id.* at 13-17. Lynn also moved to dismiss Plaintiff's unjust enrichment claim, arguing that (i) Plaintiff has an adequate remedy at law because of its contractual relationship with Lynn; and (ii) Plaintiff cannot establish that it would be inequitable for Lynn to retain the cost of tuition and other fees for the Spring 2020 semester. *Id.* at 17-20.

On November 29, 2020, this Court denied Lynn's initial

Motion to Dismiss because (1) Plaintiff plausibly alleged the existence of a valid contract for in-person education, a material breach, **[*5]** and damages; (2) Lynn failed to conclusively establish that Plaintiff's breach of contract claim was barred by affirmative defenses of impossibility or frustration of purpose; and (3) Lynn failed to establish that Plaintiff affirmatively manifested intent to approve Lynn's actions with full knowledge of all material facts. *See Gibson v. Lynn Univ., Inc.*, No. 20-CIV-81173-*RAR, 2020 WL 7024463, at *1 (S.D. Fla. Nov. 29, 2020)*.

Plaintiff then filed his Second Amended Class Action Complaint [ECF No. 46] on December 14, 2020 alleging breach of contract and unjust enrichment on behalf of himself and other similarly situated persons. The Second Amended Complaint defines the "Class" as follows:

> All persons who paid, on behalf of themselves or another, tuition or fees for in-person education in the Undergraduate Day Division or Graduate Division at Lynn University for the Spring 2020 term.

Second Am. Compl. ¶ 78. On December 28, 2020, Lynn filed both an Answer to the Second Amended Class Action Complaint [ECF No. 48] and the instant Motion to Dismiss and/or Strike the Class Allegations.

In its Motion, Lynn asks this Court to dismiss and/or strike Plaintiff's class action allegations for four reasons. First, Lynn asserts that Plaintiff's contractual **[*6]** claims are individualized and not "capable of being answered on a class-wide basis." Mot. at 2-3. Specifically, Lynn argues that because Plaintiff's claims are based on students' expectations concerning whether they would receive in-person education—and not an explicit written contractual term promising it—the Court must engage in an individualized inquiry for each student to determine if there was a contract and what its terms were. *Id.* at 6-10. Second, Lynn contends that determining damages, if any, in this case would be an individualized inquiry for each student because damages would be based on "loss of experience," which is inherently subjective. *Id.* at 3-4. Third, Lynn argues that under Eleventh Circuit precedent, "unjust enrichment claims are inherently incapable of being assessed on a class basis." *Id.* at 4. Finally, Lynn asserts that the proposed class includes many individuals who lack standing. *Id.*

**LEGAL STANDARD**

### a. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Aimco Properties, L.P., 814 F.3d 1213, 1221 (11th Cir. 2016)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))*. When reviewing a motion to dismiss pursuant to *Rule 12(b)(6)*, a court must accept as true all factual allegations contained in the **[*7]** complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp., 693 F.3d 1333, 1335 (11th Cir. 2012)*; *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)*.

A court considering a 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits—but may also consider documents referred to in the complaint that are central to the claim and whose authenticity is undisputed. *See Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 959 (11th Cir. 2009)*. While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly, 550 U.S. at 555* (quotation omitted); *Iqbal, 556 U.S. at 678*. "Dismissal pursuant to *Rule 12(b)(6)* is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004)* (citation and quotation omitted).

### b. Motion to Strike Under Fed. R. Civ. P. 12(f)

Pursuant to *Fed. R. Civ. P. 12(f)*, the "court may strike from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Nash v. O.R. Colan Group, LLC*, No. 12-60759—CIV, 2012 WL 4338817, at *1 (S.D. Fla. Sept. 20, 2012) (citing *Fed. R. Civ. P. 12(f)*). "However, '[a] motion to strike is a drastic remedy,' which is disfavored by the courts." *Id.* (citing *Thompson v. Kindred Nursing Ctrs. E., LLC, 211 F. Supp. 2d 1345, 1348 (M.D. Fla. 2002))*; *see also* **[*8]** *Exhibit Icons, LLC v. XP Cos., 609 F. Supp. 2d 1282, 1300 (S.D. Fla. 2009)*. "A motion to strike will therefore usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Gill-Samuel v. Nova Biomedical Corp., 298 F.R.D. 693, 699 (S.D. Fla. 2014)* (citation and quotation omitted).

### c. Fed. R. Civ. P. 23 and Dismissal or Striking of Class Allegations

Under *Fed. R. Civ. P. 23*, "[a] class action may be maintained only when it satisfies all the requirements of [Rule] 23(a) and at least one of the alternative requirements of *Rule 23(b)*." *Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003)*. The four prerequisites for bringing a class action set forth under *Rule 23(a)* are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

These prerequisites are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." *Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1265 (11th Cir. 2009)*.

Class actions that meet the requirements of *Rule 23(a)* may be certified under *Rule 23(b)(1)*, *(b)(2)*, or *(b)(3)*. The pertinent section in this case is *Rule 23(b)(3)*, which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, **[*9]** and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In other words, the issues raised by the class action "that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Rutstein v. Avis Rent-A-Car Sys., 211 F.3d 1228, 1233 (11th Cir. 2000)* (citations omitted).

*Rule 23* provides that the Court must—at an early practicable time—determine whether to certify the action as a class action. *See Mills v. Foremost Ins. Co., 511 F.3d 1300, 1309 (11th Cir. 2008)* (citing *Fed. R. Civ. P. 23(c)(1)(A))*. The Eleventh Circuit has indicated that "[i]n some instances, the propriety *vel non* of class certification can be gleaned from the face of the pleadings." *Id.* (citing *Jackson v. Motel 6 Multipurpose, Inc., 130 F. 3d 999, 1006 (11th Cir. 1997))*. However, "[t]he question of class certification is generally not addressed on a motion to dismiss." *Martorella v. Deutsche Bank Nat. Tr. Co., 931 F. Supp. 2d 1218,*

*1228 (S.D. Fla. 2013)* (quoting *Chaney v. Crystal Beach Capital, LLC*, No. 10-cv-1056-T-30-*TGW, 2011 WL 17639, at *2 (M.D. Fla. 2011))*. "[P]recedent ... counsels that the parties' pleadings alone are often not sufficient to establish whether class certification is proper, and the district court will need to go beyond the pleadings and permit some discovery and/or an evidentiary hearing to determine whether a class may be certified." *Mills, 511 F.3d at 1309*.

Indeed, dismissal of class allegations at the pleadings stage **[*10]** "is an extreme remedy appropriate only where a defendant demonstrates from the face of the complaint that it will be impossible to certify the classes alleged by the plaintiff regardless of the facts that the plaintiff may be able to prove." *Randy Rosenberg, D.C., P.A. v. GEICO Gen. Ins. Co., No. 19-CV-61422, 2019 WL 6828150, at *6 (S.D. Fla. Dec. 13, 2019)* (quoting *Oginski v. Paragon Props. of Costa Rica, LLC*, No. 10-21720-*CIV, 2011 WL 3489541, at *3 (S.D. Fla. Aug. 9, 2011))* (quotation marks and alterations omitted). Striking class allegations under *Fed. R. Civ. P. 12(f)* is a similarly extreme remedy that is only appropriate where the class allegations are "redundant, immaterial, impertinent, or scandalous." *See Gill-Samuel, 298 F.R.D. at 700*; *Sullivan v. Gov't Emps. Ins. Co.*, No. 617CV1755ORL40KRS, 2018 WL 4759905, at *2 (M.D. Fla. Aug. 1, 2018); *see also Lankford v. Carnival Corp.*, No. 12-24408-CIV, 2013 WL 12064497, at *6 (S.D. Fla. June 18, 2013) ("[I]t is 'rare' for courts to strike or dismiss class allegations prior to the filing of class certification motions and discovery.").

## ANALYSIS

Applying the principles set forth above, the Court finds that the extreme remedies of dismissing or striking Plaintiff's class allegations are not warranted in this case. This is not a "rare" case where it is clear from the pleadings that a class action cannot be maintained. As an initial matter, Plaintiff has pleaded sufficient facts to fulfill the *Rule 23* requirements. Plaintiff alleges that this action involves several **[*11]** questions of law and fact that are susceptible to common answers and predominate over any individual questions, such as: (i) whether Lynn contracted with the Class for in-person educational services; (ii) whether Lynn contracted with the Class for access to campus facilities and services; (iii) whether Lynn accepted money from the Class for the provision of in-person educational services and access to campus facilities and services; and (iv) whether Lynn breached its obligations to provide the

contracted-for, in-person educational services and access to campus facilities and services. *See* Second Am. Compl. ¶ 83.

Plaintiff further alleges that his claims "are typical of the other Class members' claims because Plaintiff and the other Class members each paid tuition and fees for the Undergraduate Day Division or Graduate Division at Lynn University for the Spring 2020 semester, but were not provided the educational and other services that those costs were meant to cover." *Id.* ¶ 86. Additionally, Plaintiff asserts that there are thousands of Class members, making joinder impracticable, *id.* ¶¶ 80-82, and that he can adequately represent the class because his interests are aligned with those **[*12]** of the proposed Class. *Id.* ¶¶ 89-91.

The crux of Lynn's argument is that the Court should dismiss or strike Plaintiff's class allegations because they fail to meet the *Rule 23* commonality and predominance requirements. *See* Mot. at 6. Specifically, Lynn argues that the central inquiry in this case—whether there was a contract for in-person education—must be determined on an individualized basis for each student. *Id.* at 6-11. Lynn also contends that the damages Plaintiff alleges are subjective and individualized because they are based on a "loss of experience." *Id.* at 11-16.

The Court disagrees that it would be impossible for Plaintiff's proposed class to satisfy the commonality and predominance requirements. The Eleventh Circuit has described the commonality requirement as a "low hurdle" or a "light" burden, as commonality "does not require that all questions of law and fact raised be common." *Alhassid v. Bank of Am., N.A., 307 F.R.D. 684, 696 (S.D. Fla. 2015)* (quoting *Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1356 (11th Cir. 2009)*; *Vega, 564 F.3d at 1268*). "The commonality element is generally satisfied when a plaintiff alleges that defendants have engaged in a standardized course of conduct that affects all class members." *In re Checking Acct. Overdraft Litig., 275 F.R.D. 666, 673 (S.D. Fla. 2011)* (internal quotation omitted).

Here, it appears that questions concerning what the operative contractual terms are between Lynn and its students **[*13]** may be capable of class-wide proof. Plaintiff alleges that he and other similarly situated students entered into a binding contract with Lynn for in-person education when they enrolled in and paid for the Undergraduate Day Division or Graduate Division. *See* Second Am. Compl. ¶¶ 16-27, 86. Plaintiff contends that

the terms of that contract are dictated by the university's publications, policies, invoices, and the parties' course of conduct. *See id.* ¶ 15. It is not clear to the Court from the pleadings that the nature of such a contractual relationship is not susceptible to class-wide proof based on the publications, policies, and other materials Lynn provided to its students. Nor is the Court convinced that Plaintiff's contractual claims would necessarily require delving into the individual state of mind of each student. At the very least, it would be premature for the Court to make that finding at this stage in the litigation given that the parties "take starkly different positions as to the number and extent of issues that will be involved in this case, and the method and ease of proof for each." *Mills, 511 F.3d at 1309-10*. And it is certainly not "obvious from the pleadings that the individual issues would [*14] overwhelm the common issues." *Herrera v. JFK Med. Ctr. Ltd. P'ship, 648 F. App'x 930, 934 (11th Cir. 2016)*.

The Court is also unpersuaded that the potential for individualized damages issues makes class certification impossible in this case. For example, in *Herrera*, patients covered under Florida statutory personal injury protection (PIP) insurance brought a class action suit against hospitals and their parent companies for excessive charges. *Id. at 931-32*. The defendant hospitals argued that to determine damages for each class member, the "district court would have to analyze whether a class member's PIP insurance was exhausted, whether that member had co-insurance that would have covered additional expenses, and whether those charges were reasonable and related to the motor vehicle accident." *Id. at 936*. In reversing the district court's grant of the defendants' motion to strike class action allegations, the Eleventh Circuit indicated that the "presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Id.* (quotation omitted).

Indeed, the Eleventh Circuit has recognized that although there are "extreme cases in which computation of each individual's damages will be so complex, fact-specific, and difficult that the burden [*15] on the court system would be simply intolerable ... such cases rarely, if ever, come along." *Klay v. Humana, Inc., 382 F.3d 1241, 1260 (11th Cir. 2004)*. Here, the individualized damages issues are not so extreme as to preclude class certification at the pleadings stage—particularly considering Plaintiff's representation that he "can and will present a class-wide impact and damages model" to support his motion for class certification. Resp. at 21; *see Rosenberg, 2019 WL 6828150, at *8* ("Plaintiff may,

through the course of discovery, be able to establish that the damage calculations for each individual class member are formulaic, rather than fact specific ...").

Lynn also argues that Plaintiff's unjust enrichment claims are inherently individualized because the Court "must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist." Mot. at 16 (quoting *Vega, 564 F.3d at 1274*). Although unjust enrichment claims are usually unsuitable for class treatment, this is not always the case. *See In re Checking Account Overdraft Litig., 286 F.R.D. 645, 657 (S.D. Fla. 2012)* ("Unjust enrichment claims can be certified for class treatment where there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not."); *Cty. of Monroe, Fla. v. Priceline.com, Inc., 265 F.R.D. 659, 668 (S.D. Fla. 2010)* ("The County's ... unjust enrichment [*16] claims are therefore premised upon the same alleged injury experienced by the other class members, and will be subject to class-wide proof."); *James D. Hinson Elec. Contr. Co. v. Bellsouth Telecomms., Inc., 275 F.R.D. 638, 647 (M.D. Fla. 2011)* ("[W]hen the defendant's conduct is the same, it is difficult to conceive of any significant equitable differences between class members.") (quotation omitted).

"[T]he Eleventh Circuit's underlying concern [with certification of unjust enrichment claims] is that unjust enrichment claims typically require individualized inquiries into the equities of each class member's interaction with each defendant." *Cty. of Monroe, Fla., 265 F.R.D. at 671*. Given that Lynn's alleged conduct as to each class member in this case is the same—*i.e.*, retaining tuition after ceasing to provide in-person instruction and access to campus services and facilities—it is not obvious from the pleadings that there are significant equitable differences among the proposed class. Lynn argues that equitable considerations may be different, for example, for students who regularly want to and expect to use campus services versus those who do not. However, the Court agrees with Plaintiff that it is premature to determine at this stage whether such variation exists among the proposed class.

In support of its arguments [*17] for dismissal or striking of the class allegations, Lynn relies heavily on the *Vega* case. *See* Mot. at 8-9, 16-17. Without embarking on an exhaustive analysis of that case, the Court notes that it does not support the proposition that

class allegations should be dismissed and/or stricken during the pleading stage. Unlike this case, *Vega* reviewed a district court's determination of class certification *after* the factual record had already been developed and *after* the classes had already been certified. *564 F.3d at 1263-64*. The parties in *Vega* had the opportunity to conduct pre-certification discovery, which is precisely what Lynn seeks to foreclose. *Id. at 1263* ("On January 9, 2007, following the close of all discovery (including merits discovery) and more than a year after filing the complaint, Vega moved for class certification.").

Moreover, the fatal deficiencies in the *Vega* breach of contract class allegations are not present here. Defendant argues that the "[*Vega*] Court explained that because Plaintiff could not utilize identical evidence on behalf of every member of the class to prove offer, acceptance, consideration or the essential terms of the purported contract, he was unable to show commonality under a breach **[*18]** of contract theory." Reply at 7. However, the *Vega* court specifically noted that the plaintiff's breach of contract theory failed because the plaintiff did not allege "in his complaint the existence of a common contract under which [the defendant] employed all class members." *564 F.3d at 1272*. Therefore, the *Vega* court determined that the plaintiff "could not utilize identical evidence on behalf of every member of the class to prove offer, acceptance, consideration, or the essential terms" and that the class thus failed to fulfill the commonality and predominance requirements. *Id.* Here, in contrast, Plaintiff's Complaint alleges a common contract for in-person, on-campus education between Lynn and students enrolled in the Undergraduate Day Division and Graduate Division. *See* Second Am. Compl. ¶¶ 104-105.

Lynn's final argument is that the proposed class includes individuals who lack standing.[1] Lynn argues

---

[1] Lynn also argues that the class includes individuals whom Plaintiff lacks standing to represent because they are either graduate students (when he is an undergraduate) or are students who reenrolled in Summer or Fall 2020 (when Plaintiff did not). *See* Mot. at 20-21. The Court agrees with Plaintiff that this appears to go to the issue of typicality under *Rule 23*, which is more properly addressed at the class certification stage. *See* Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.) ("Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and

that because the proposed class includes anyone "who paid, *on behalf of themselves or another*, tuition or fees" for the Spring 2020 term, it encompasses parents or others who paid tuition but were not students at Lynn and therefore did not have a contractual relationship with the university. *See* Mot. **[*19]** at 20. However, at the pleadings stage, the Court need only determine "that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)*; *see also Bankhead v. First Advantage Background Servs. Corp.*, No. 117CV02910LMMJCF, 2018 WL 1789419, at *3 (N.D. Ga. Jan. 30, 2018), *report and recommendation adopted*, No. 1:17-CV-2910-*LMM-JCF, 2018 WL 1794375 (N.D. Ga. Feb. 27, 2018)*. "To have standing to represent a class, a party must not only satisfy the individual standing prerequisites, but must also be part of the class and possess the same interest and suffer the same injury as the class members." *Mills, 511 F.3d at 1307*.

In the Complaint, Plaintiff adequately satisfies the requirements for Article III standing by alleging that he: (1) suffered an injury in fact ("Plaintiff and the Class did not receive their bargained-for, in-person education. Nor did they receive the services for which they paid separately itemized fees."), *see* Second Am. Compl. ¶¶ 3, 71-73, 75, 112-13, 119; (2) that is fairly traceable to the challenged conduct (he can trace that injury to Lynn's campus closure and moving all courses online), *see id.* ¶¶ 2, 54-60, 68-71, 72-73, 75, 119, 121, 133; and (3) that is likely to be redressed by a favorable **[*20]** judicial decision (he can be compensated by receiving damages in the form of a partial refund of his tuition and fees paid), *see id.* ¶¶ 4, 77, 121-25, 132-34.[2] Accordingly, the Court concludes that Plaintiff has sufficiently alleged that he has standing individually and as a putative class representative.

## CONCLUSION

---

adequacy of representation."). Further, even if there are inadequacies in the current class definition as Lynn contends, this Court "retains the ability to refine it at a later stage in the litigation." *MSPA Claims 1, LLC v. Covington Specialty Ins. Co.*, No. 19-21583-*CIV, 2020 WL 5984382, at *15 (S.D. Fla. May 12, 2020)* (citing *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co., 321 F.R.D. 688, 696 (S.D. Fla. 2017)*).

[2] *See Bloomgarden v. Allstate Fire & Cas. Ins. Co., No. 19-CV-62879-RAR, 2020 WL 6375169, at *2-3 (S.D. Fla. Oct. 30, 2020)* (describing requirements to establish Article III standing).

2021 U.S. Dist. LEXIS 54324, *20

For the foregoing reasons, the Court is not persuaded at this stage in the litigation that class certification would be "impossible" regardless of any facts revealed in discovery. The arguments Lynn advances are more appropriate for the class certification stage, at which point the Court can consider them with the benefit of a more developed factual record. Thus, without opining on the merits of class certification or the underlying class allegations, the Court finds that Plaintiff has adequately pleaded the requirements of standing and *Rule 23* as to the class allegations for breach of contract and unjust enrichment. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss and/or Strike Plaintiff's Class Action Allegations [ECF No. 49] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 23rd day of March, 2021.

/s/ Rodolfo A. Ruiz II

**RODOLFO A. [*21]  RUIZ II**

**UNITED STATES DISTRICT JUDGE**

**End of Document**

# **EXHIBIT D**

*Metzner v. Quinnipiac Univ.*,
Case No. 3:20-cv-00784-KAD,
2021 U.S. Dist. LEXIS 56744 (D.
Conn. Mar. 25, 2021)

No *Shepard's* Signal™
As of: March 26, 2021 1:30 PM Z

## *Metzner v. Quinnipiac Univ.*

United States District Court for the District of Connecticut

March 25, 2021, Decided

Case No. 3:20-cv-00784 (KAD)

**Reporter**
2021 U.S. Dist. LEXIS 56744 *

ZOEY METZNER, DOMINIC GRAVINO, DAVE BRUNEAU, RICHARD HOTTER, individually and on behalf of all others similarly situated, Plaintiffs, v. QUINNIPIAC UNIVERSITY, Defendant.

**Notice:** Decision text below is the first available text from the court; it has not been editorially reviewed by LexisNexis. Publisher's editorial review, including Headnotes, Case Summary, Shepard's analysis or any amendments will be added in accordance with LexisNexis editorial guidelines.

## Core Terms

in-person, tuition, Plaintiffs', online, semester, Spring, allegations, on-campus, promise, unjust enrichment, malpractice, campus, contractual, conversion, facilities, courses, Bulletin, learning, refund, breach of contract, reimbursement, undergraduate, parties, breach of contract claim, programs, attend, remote, funds, district court, injury-in-fact

## Opinion

**[*1] MEMORANDUM OF DECISION**

**RE: DEFENDANT'S MOTION TO DISMISS (ECF NO. 35)**

Kari A. Dooley, United States District Judge:

Defendant Quinnipiac University ("Quinnipiac" or the "Defendant") has moved pursuant to *Fed. R. Civ. P. 12(b)(6)*

to dismiss the claims of Plaintiffs Zoey Metzner ("Metzner"), Dominic Gravino ("Gravino"), Dave Bruneau ("Bruneau"), and Richard Hotter ("Hotter," and collectively, the "Plaintiffs") asserted in Plaintiffs' First Amended Complaint (the "FAC," ECF No. 25). In this putative class action, Plaintiffs bring claims against Quinnipiac for breach of contract, unjust enrichment, and conversion arising out of Quinnipiac's alleged failure to issue tuition or fee refunds to students following its decision to transition to online learning during the Spring 2020 semester in response to the COVID-19 pandemic. Metzner and Gravino were both enrolled as full-time students at Quinnipiac during the 2019-2020 academic year. (FAC ¶¶ 10-11.) Bruneau and Hotter (the "Parent Plaintiffs") are each parents of undergraduate students who were enrolled full-time at Quinnipiac during the 2019-2020 academic year. (*Id.* ¶¶ 12-13.) Following oral argument on the motion to dismiss, the Court directed the parties to file **[*2]** supplemental briefs addressing whether the Parent Plaintiffs have plausibly alleged the requirements of Article III

1

standing with respect to the theories of liability asserted in the FAC. (ECF No. 65.) The Court has considered the parties' supplemental briefs (ECF Nos. 68, 69), in addition to Quinnipiac's supporting memorandum of law (ECF No. 36), Plaintiffs' opposition memorandum (ECF No. 40), Quinnipiac's reply brief (ECF No. 46), and the various notices of supplemental authority filed by the parties. (ECF Nos. 56, 62, 66-67, 70-75.) For the reasons that follow, the motion to dismiss is GRANTED in part and DENIED in part and the Parent Plaintiffs' breach of contract and unjust enrichment claims are DISMISSED for lack of standing.

**Legal Standards**

"*Article III, Section 2 of the Constitution* limits the jurisdiction of the federal courts to the resolution of 'cases' and 'controversies.'" *Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012)* (quotation marks omitted). "This limitation is 'founded in concern about the proper-and properly limited-role of the courts in a democratic society.'"

*Id.* (quoting *Warth v. Seldin, 422 U.S. 490, 498 (1975)).* "The doctrine of standing gives meaning to these constitutional limits by 'identifying those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014)* (quoting *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992))* **[*3]** . "Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*." *Cent. States Se. & Sw. Areas Health & Welfare Fund v.Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).* "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List, 573 U.S. at 157-58* (quoting *Lujan, 504 U.S. at 560-61.*) In determining whether a plaintiff has standing to sue, this Court must accept the complaint's material allegations as true and construe the allegations in the plaintiff's favor.

2

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l, 790 F.3d 411, 417 (2d Cir. 2015).*

On a motion to dismiss under *Rule 12(b)(6)*, the Court must likewise accept the complaint's factual allegations as true and must draw inferences in the plaintiff's favor. *Littlejohn v. City ofNew York, 795 F.3d 297, 306 (2d Cir. 2015).* The complaint "must 'state a claim to relief that is plausible on its face,'" setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kolbasyuk v. Capital Mgmt.Servs., LP, 918 F.3d 236, 239 (2d Cir. 2019)* (quoting*Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)*, and *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).* "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020)* (quoting *Twombly, 550 U.S. at 556*). At this stage "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Id.*

## Background and Allegations [*4]

The Court summarizes the allegations, which are accepted as true for purposes of the instant motion, in substantially similar form as was set forth in the Court's memorandum of decision denying Quinnipiac's motion to stay discovery. (ECF No. 47.) Quinnipiac is an institution of higher education located in Hamden, Connecticut, which has a current enrollment of approximately 10,290 students across its College of Arts and Sciences and eight professional schools. (FAC ¶¶ 21-22.) Plaintiffs and Plaintiffs' children registered for on-campus courses during the Spring 2020 semester, which registrations Quinnipiac accepted. (*Id.* ¶ 45.) All

3

Plaintiffs remain in good financial standing with Quinnipiac, "having paid in whole or in combination tuition, fees, costs, and/or room and board charges assessed and demanded by Defendant for the Spring 2020 term." (*Id.* ¶ 14.)

On March 15, 2020, Quinnipiac informed Plaintiffs that beginning on March 18, 2020, classes would be held online for the remainder of the Spring 2020 semester in response to the COVID-19 pandemic. (*Id.* ¶¶ 4, 61.) The online classes that Quinnipiac ultimately provided were not equivalent to the in-person, on-campus education that Plaintiffs **[*5]** and their children chose and deprived the Plaintiffs and Plaintiffs' children of many hands-on educational opportunities and experiences. (*Id.* ¶¶ 67-68.) Quinnipiac has allegedly refused to reimburse or refund Plaintiffs and others similarly situated for the tuition and fees they have expended for on-campus instruction and for programs, services, activities, facilities, events, and other resources and benefits that were no longer available to Plaintiffs and their children as a result of the transition to remote learning.

(*E.g.*, *id.* ¶¶ 5-6, 16-18.) Plaintiffs allege that while they and their children could have pursued online degrees, they specifically opted for an in-person classroom experience and that Quinnipiac did not previously offer Plaintiffs' or Plaintiffs' children's degree programs online. (*Id.* ¶ 15.) Plaintiffs further allege that the transition to online learning rendered it difficult to access and communicate with Quinnipiac's professors, many of whom were unprepared to deliver an effective educational experience using remote learning technologies. (*Id.* ¶¶ 19-20.)

The FAC includes a number of examples of how Quinnipiac allegedly emphasizes in-person interactions and experiences **[*6]** and the unique attraction of its campus and facilities in its effort to recruit prospective students, while neglecting to highlight remote learning opportunities as a core educational feature. (*Id.* ¶¶ 24-33.) Plaintiffs allege that they specifically contracted for on-campus instruction for the Spring 2020 semester and principally cite Quinnipiac's 2019-2020

4

Official Bulletin (the "Bulletin") as setting forth the terms of

this contract. (*Id.* ¶¶ 34-35; Ex. C.) Plaintiffs allege that the Bulletin describes many of its in-person offerings in such terms as providing a "hands-on experience," "campus laboratory experience," "a supportive learning environment characterized by small classes with access to faculty and well-equipped laboratory facilities," "state-of-the-art facilities," and other characteristics that are germane only to on-campus instruction. (*Id.* ¶ 37.) According to Plaintiffs, Quinnipiac's default or customary mode of educational delivery is to provide in-person instruction, and when registering for classes for the Spring 2020 semester, Plaintiffs and their children did not otherwise select the box available on Quinnipiac's website which would have enabled them to search and **[\*7]** register for "Online Courses Only." (*Id.* ¶¶ 41-42.) Plaintiffs further allege that Quinnipiac's Spring 2020 courses were listed as being held in specific on-campus locations. (*Id.* ¶ 33.) Thus, it was "Plaintiffs' and Class Members' reasonable expectation when registering for classes for the Spring 2020 semester . . .

that those classes would be provided on-campus" and Plaintiffs allege that Quinnipiac became contractually obligated to deliver in-person instruction via the Bulletin's express terms in combination with Quinnipiac's other publications and promotional materials. (*Id.* ¶¶ 42, 44.)

For the Spring 2020 semester Quinnipiac charged its undergraduate students $24,280 in full-time tuition plus a $720 technology fee. (*Id.* ¶ 45.) The annual fees for undergraduate room and board ranged from $14,360 to $18,270 and fees for dining services ranged from $1,685 to $1,885 per semester. (*Id.*) Plaintiffs allege that these fees "are significantly higher than online-only programs" offered both by Quinnipiac and other institutions of higher education. (*Id.* ¶¶ 46- 47.) For example, for the Spring 2020 semester, Plaintiffs allege that Quinnipiac charged students between $515 and $575 per credit **[\*8]** for undergraduate online degree programs, whereas students taking 12-16 credits per semester for on-campus courses were charged between $1,517.50 and

5

$2,023.33 per credit. (*Id.* ¶¶ 45, 48.) Despite having allegedly bargained and paid for on-campus courses and access to campus facilities and other resources for the entire Spring 2020 semester, Plaintiffs and Plaintiffs' children have not been permitted to attend classes in person since March 15, 2020. (*Id.* ¶¶ 51-52.)

While Quinnipiac made the decision in April 2020 to provide students housing and dining credits for the Spring 2020 semester, it has not offered tuition or fee refunds. (*Id.* ¶¶ 80-81.) Plaintiffs acknowledge that Quinnipiac's decision to close its campus and to offer its classes exclusively online in March

of 2020 in response to the COVID-19 pandemic was justified but assert that they have suffered significant losses as a result of Quinnipiac's refusal to offer a prorated reimbursement of tuition and fees to students who paid for full-time on-campus instruction for the Spring 2020 semester. (*Id.* ¶¶ 63-67.) Put simply, Plaintiffs allege that "[t]he online classes Plaintiffs and their peers have been provided are not equivalent **[\*9]** to the in-person, campus experience that Plaintiffs and other Quinnipiac students chose for their university education." (*Id.* ¶ 68.)

Plaintiffs bring claims sounding in breach of contract (Count One); breach of implied contract (Count Two); unjust enrichment in the alternative to the contract claims (Count Three); and conversion (Count IV). Plaintiffs seek to certify a class pursuant to *Fed. R. Civ. P. 23(b)(2)* and *(b)(3)* on behalf of themselves and:

All people paying Defendant, in whole or in part, personally and/or on behalf of others, for tuition, fees, and/or room board for in-person instruction and use of campus facilities, but who were denied use of and/or access to in-person instruction and/or campus facilities by Defendant for the Spring 2020 academic term or any subsequent term.

(*Id.* ¶ 83.)

6

### Discussion

### The Parent Plaintiffs' Standing to Sue

As noted previously, Article III standing is comprised of three elements: injury-in-fact, causation, and redressability. *See Lujan, 504 U.S. at 560-61*. "Under the injury-in-fact requirement, 'the first and foremost' element, 'a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" **[\*10]** *Vullo v. Office of Comptroller of Currency, 378 F. Supp. 3d 271, 282 (S.D.N.Y. 2019)* (quoting *Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547-48 (2016))*. As to the second element, "there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."

*Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013)* (quoting *Lujan, 504 U.S. at 560*) (alterations, ellipses, and emphasis omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Lujan, 504 U.S. at 561*).

In their supplemental brief, the Parent Plaintiffs assert that they have satisfied each of the three requirements of Article III standing. They argue that the loss of tuition payments remitted to Quinnipiac for their children's in-person education constitutes an injury-in-fact, which is fairly traceable to Quinnipiac's decision not to issue tuition or fee reimbursements for the Spring 2020 semester. They further assert that their alleged injuries are redressable through a favorable decision finding Quinnipiac liable to them for compensatory damages.

Quinnipiac, on the other hand, argues that the Parent Plaintiffs lack standing because they do not allege any facts that would establish that they themselves [*11] were entitled to on-campus instruction or facilities or that they entered into a contract for educational services with Quinnipiac directly. Nor do the Parent Plaintiffs allege that they were an intended third-party beneficiary of

7

the alleged contract between Quinnipiac and their children. As Quinnipiac observes, several courts have dismissed parent-plaintiffs in similar class action lawsuits brought against colleges and universities during the current public health crisis-recognizing that the fact that a parent pays tuition on behalf of his or her child does not confer standing on that parent to sue for breach of an obligation that the college or university owed the child. *See, e.g.*, *Espejo v. Cornell Univ.*, No. 3:20-CV-467 *(MAD/ML), 2021 WL 810159, at *2 (N.D.N.Y. Mar. 3, 2021)* ("Plaintiffs do not allege that Plaintiff Espejo's child is a minor, that he directly contracted with Cornell [University], or that he is an intended third-party beneficiary. . . . Without such allegations, Plaintiff Espejo cannot demonstrate injury-in-fact"); *Gociman v. Loyola Univ. of Chicago, No. 20 C 3116, 2021 WL 243573, at *2 (N.D. Ill. Jan. 25, 2021)* (similarly finding parents' allegations insufficient to establish an injury-in-fact where parents alleged that they paid their children's tuition and fees but did not enter into a contract with the defendant [*12] nor allege that they were the third-party beneficiary of any such contract, and citing, *inter alia*, *Bergeron v. Rochester Inst. of Tech., No. 20-CV-6283 (CJS), 2020 WL 7486682, at *3 (W.D.N.Y. Dec. 18, 2020)*, and *Lindner v. Occidental Coll.*, No. CV 20-8481-*JFW (RAOx), 2020 WL 7350212, at *5 (C.D. Cal. Dec. 11, 2020)*, for the same proposition).

Quinnipiac also cites other decisions outside of this specific context that likewise recognize that a parent lacks standing to sue an educational institution for an alleged injury to his or her child.

*See, e.g.*, *Doe v. Univ. of the S., 687 F. Supp. 2d 744, 761 (E.D. Tenn. 2009)* (holding, in suit arising from student's withdrawal from university following Title IX proceeding, that parents lacked standing to sue university in contract or quasi-contract based on their payment of tuition on behalf of their son, as "[i]t is fairly evident that the 'payment of tuition does not create a contractual relationship between parents and a college' when the parents' child is over the age of majority")

8

(quoting *Apffel v. Huddleston, 50 F. Supp. 2d 1129, 1133 (D. Utah 1999))*; *McCormick v. Dresdale*, No. CIV.A. 09-474 S, 2010 WL 704853, at *2 (D.R.I. Apr. 28, 2010) (dismissing parents' breach of contract claims against Brown University in suit involving student's withdrawal from university following sexual accusation, as "the parents were not third party beneficiaries to any contract between William, who turned eighteen . . . and Brown") (citing [*13] *Doe v. Univ. of the S., 687 F. Supp. 2d 744*).

Plaintiffs do not cite any contrary authority and instead argue that these cases are inapplicable and/or rely upon flawed reasoning because they do not consider the distinct contractual nature of the Parent Plaintiffs' claims, or the fact that the Parent Plaintiffs have suffered an injury-in-fact in the form of the loss of the payments that they remitted to Quinnipiac. They further argue that given these allegations of a cognizable injury, the issue is not one of Article III standing but, rather, "contractual standing," citing *SM Kids, LLC v. Google LLC, 963 F.3d 206 (2d Cir. 2020)*. There, the Second Circuit held that the district court's conclusion that the plaintiff lacked standing to enforce a settlement agreement arising from a trademark infringement litigation, which only the holder of the trademark could enforce, erroneously conflated contractual standing with constitutional standing. *See id. at 211*. "Contractual standing," the Court of Appeals indicated, "is distinct from Article III standing and does not implicate subject-matter jurisdiction.

. . . Although the question of whether Google breached a contract with SM Kids depends on whether SM Kids enjoyed a contractual relationship with Google, the existence of such a relationship is not [*14] a prerequisite to a court's power to adjudicate a breach-of-contract claim." *Id.* Therefore, the Second Circuit explained, while the fact that the plaintiff may not have held a valid assignment of the trademark would defeat its success on the merits, that issue did not have any bearing on the plaintiff's ability to establish an injury-in-fact, which was demonstrated by its

9

allegation that it suffered economic losses as a result of the

defendant's alleged violation of the settlement agreement. *See id. at 211-12*.

The Court would agree with Plaintiffs that *SM Kids* might compel the conclusion that the issue here is one of contractual rather than constitutional injury *if* the Parent Plaintiffs had alleged an injury arising from a breach of the contract specified in the Amended Complaint. However, the Plaintiffs have not plausibly alleged any contract between Quinnipiac and the Parent Plaintiffs. The Plaintiffs only plausibly plead a contract between Quinnipiac and its students, which, as discussed above, does not confer any rights upon the Parent Plaintiffs. Accordingly, *SMKids* is inapposite. While the FAC obfuscates any purported distinction between the contractual obligation allegedly owed to the [*15] students and that owed to the parents, it is readily apparent from the face of the Amended Complaint, as confirmed by counsel at oral argument, that the Parent Plaintiffs are *not* alleging that Quinnipiac had a contractual obligation to provide the Parent Plaintiffs themselves in-person educational services, or any other services for that matter. (*Cf.,e.g.*, FAC ¶ 14 (alleging that "Plaintiffs paid Defendant for opportunities and services they or their children did not receive, including on-campus education, facilities, services, and activities"); *id.* ¶

44 (alleging that "Defendant became contractually obligated to provide on-campus classes to Plaintiffs and Class Members").) Thus, to the extent that the Parent Plaintiffs believe that they have suffered a financial loss by paying for in-person instead of online classes, such loss does not derive from any alleged contract with Quinnipiac but, rather, from a private arrangement between the Parent Plaintiffs and their children. *See Salerno v. Fla. S. Coll., 488 F. Supp. 3d 1211, 2020 WL 5583522, at *4 (M.D. Fla. 2020)* (observing that mother seeking reimbursement of tuition paid for Spring 2020 semester on behalf of her daughter did not "adequately explain how any action on Florida So[u]thern College's part injured her," and [*16] concluding that "the lack of injury to [the

10

mother] is clear regardless of whether [the mother] provided financial support to her daughter" as "[t]hat arrangement was between mother and daughter" and "does not establish a relationship between the College and [the mother]"). In other words, it is the student and not the parent that has suffered the alleged injury-in-fact that is traceable to the alleged actions of Quinnipiac for purposes of Article III. *See also Gociman, 2021 WL 243573, at *2* ("Once a student reaches the age of majority, courts have routinely held that parents lack standing to bring claims against their adult children's colleges and universities, even when the parents pay tuition on behalf of

their children") (quoting *Lindner, 2020 WL 7350212, at *5*).1

For similar reasons, the Parent Plaintiffs lack standing to bring an unjust enrichment claim against Quinnipiac, as the theory of unjust enrichment is one of a contract implied in law-where "justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." *Vertex, Inc. v. City of Waterbury, 278 Conn. 557, 573, 898 A.2d 178 (2006)* (citation omitted); *see also Doe v. Univ. of the S., 687 F. Supp. 2d at 762* (concluding that student's parents "have failed to plead facts or cite law which establish they have standing [*17] to pursue a contract implied in law or unjust enrichment claim against the University").

The Court therefore dismisses the Parent-Plaintiffs' claims as to Count One, Two, and Three for lack of standing.

1 The Court also rejects the reasoning of *Uddin v. New York Univ., 47 Misc. 3d 38, 6 N.Y.S.3d 900 (1st Dep't 2014)*, cited by the Plaintiffs, in which the Appellate Division of the New York Supreme Court held that a father had stated a viable breach of contract claim against New York University in a suit seeking reimbursement for tuition made by the plaintiff on behalf of his son. In so holding however the court did not consider the issue of standing, and the overwhelming federal caselaw cited by Quinnipiac demonstrates that the vast majority of courts that have addressed the issue have found that a parent lacks standing to enforce a contract between his or her child and the university that the child is attending. Nor does the Court agree with Plaintiffs that the fact that students must report their parents' income in order to obtain federal student aid imposes a "requirement" on the Plaintiff Parents, or on any parent, to pay his or her child's tuition that becomes enforceable via a breach of contract action.

11

## Whether the Educational Malpractice Doctrine [*18] Bars the Plaintiffs' Claims

In the motion to dismiss, Quinnipiac principally argues that all of the Plaintiffs' claims are barred by the educational malpractice doctrine. Under this doctrine, "courts have almost universally held that claims of 'educational malpractice' are not cognizable." *Gupta v. New BritainGen. Hosp., 239 Conn. 574, 591, 687 A.2d 111 (1996)* (footnote omitted). The doctrine applies "[w]here the essence of the complaint is that an educational institution breached its agreement by failing to provide an effective education, [and] the court is asked to evaluate the course of instruction and called upon to review the soundness of the method of teaching that has been adopted by that educational institution." *Id. at 590* (quoting *Ross v. Creighton University, 957 F.2d 410, 416 (7th Cir. 1992)*)

(alterations and ellipsis omitted). "Among other problems for adjudication, these claims involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached." *Id. at 591*. However the Connecticut Supreme Court has recognized two exceptions to this prohibition. The first, which is not alleged here, "would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary **[\*19]** to obtain certification in a particular field." *Id. at 592*. "The second would arise if the educational institution failed to fulfil[l] a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id*. at 593.2

Quinnipiac argues that all of Plaintiffs' claims "hinge on the allegation that the Plaintiffs received an education that was worth less than what they paid because of the transition to online learning," and are accordingly precluded by the doctrine. (Def.'s Mem. at 2.) Quinnipiac further observes that "[w]hen the gravamen of the complaint is that the institution failed to provide an

2 The doctrine also does not prohibit claims alleging that the institution "act[ed] arbitrarily, capriciously, or in bad faith," *id. at 595*, although the FAC does not invoke this exception.

12

effective or quality education, all of the claims asserted in the complaint are to be construed as educational malpractice claims, no matter what labels or conclusions are used in pleading those claims." (*Id*. at 12.) *See, e.g., Jacobs v. Ethel Walker Sch. Inc.*, No. CV020515279S, *2003 WL 22390051, at \*4 (Conn. Super. Ct. Sept. 30, 2003)* ("[A] plaintiff does not have to use the words 'educational malpractice' in order for a cause of action to sound in the tort **[\*20]** of educational malpractice") (citing *Vogel v. Maimonides Academy of Western Conn., Inc., 58 Conn. App. 624, 631, 754 A.2d 824 (App. Ct. 2000))*. Citing the complaint's references to "vastly different" or "less valuable" online classes (FAC ¶¶ 66, 102, 112), Quinnipiac argues that Plaintiffs' claims will require a factfinder to determine whether the remote teaching and services that Plaintiffs received had substantively less educational value than their in-person counterparts.

In response, Plaintiffs assert that they are not contesting the manner with which Quinnipiac and its faculty implemented online teaching instruction or asserting that classes should have been taught differently. Instead, Plaintiffs maintain that they challenge Quinnipiac's decision to retain tuition and fees for educational services that the institution allegedly promised but never provided. As such, Plaintiffs characterize their

claims as commercial as opposed to academic and submit that this case does not implicate the concerns expressed in *Gupta* regarding improper judicial forays into evaluations of the quality or value of academic instruction, issues on which educational institutions are normally afforded deference. Rather, Plaintiffs argue that this case falls squarely into the second exception recognized in **[\*21]** *Gupta* for claims arising out of an alleged failure to fulfill a specific contractual promise.

On the issue-whether this type of tuition reimbursement suit implicates the educational malpractice doctrine-courts around the country are somewhat divided. The Defendant cites the Court to *Paynter v. New York Univ., 66 Misc. 2d 92, 319 N.Y.S.2d 893 (1st Dep't 1971)*, a brief

13

*per curiam* opinion in which the Appellate Division of the New York Supreme Court reversed an award of a tuition refund to the parent of a son whose classes were suspended at NYU from May 7, 1970 through the remainder of the school year prior to final examinations due to anti-war demonstrations on campus. The court there noted that "while in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year, the services rendered by the university cannot be measured by the time spent in a classroom," while also citing the general principle that disfavors judicial intervention into matters of educational governance. *Id. at 894*. However, one district court aptly distinguished *Paynter* from the situation here by observing "that there is a world of difference between canceling some classes-in the absence of any affirmative guarantee on the number of **[\*22]** classes to be held-and not affording students services and benefits for an extended period of time despite … a promise [to do so]," as during half of the entire Spring 2020 semester. *Ford v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-470, *2020 WL 7389155, at \*5 (N.D.N.Y. Dec. 16, 2020)*; *see also In re Columbia TuitionRefund Action*, Nos. 20-CV-3208 (JMF), 20-CV-3210 *(JMF), 2021 WL 790638, at \*6 (S.D.N.Y. Feb. 26, 2021)* (distinguishing *Paynter* in light of the opinion's emphasis on an "insubstantial change made in the schedule of classes" as precluding the plaintiff's recovery, as "the Court cannot conclude as a matter of law that Pace[ University's] adoption of online instruction from mid-March through the end of the spring semester was an 'insubstantial change'") (quoting *Paynter, 319 N.Y.S.2d at 894*).

In its Notices of Supplemental Authority, Quinnipiac also cites to two recent decisions construing this issue in its favor in the context of the COVID-19 pandemic. In *Gociman, 2021 WL 243573, at \*1*, the plaintiffs brought a putative class

action on behalf of individuals who had paid tuition or fees for in-person instruction at Loyola University of Chicago during the Spring

14

2020 semester, "seek[ing] damages representing the difference in value between in-person classes and access to facilities, and the online education they received." The district [*23] court found that "the theory underlying all of plaintiffs' claims is that the education plaintiffs received once defendant transitioned to remote instruction in response to the COVID-19 pandemic was 'worth significantly less than the value of live classes.'" *Id*. at *3. Thus the court found that "resolution of Plaintiffs' claims would require the Court to make judgments about the quality and value of the education defendant provided in the Spring 2020 semester." *Id*. (quoting *Linder, 2020 WL 7350212, at *7*). In so holding the court rejected plaintiffs' argument that they were "not challenging the quality of their education, but rather alleging that defendant failed to perform the educational service 'at all'"-an argument which the court found belied by the FAC's "repeated[] claims that the online instruction was 'worth less' than the traditional in-person instruction." *Id*. Likewise, in *Linder*, cited therein, the district court reached the same conclusion. *See 2020 WL 7350212, at *7* (finding that resolution of plaintiffs' claims that defendant's remote instruction "was not 'worth the amount charged' or 'in any way the equivalent of an in-person education[,]'" that its "Spring 2020 programs were 'sub-par' and that online classes lacked 'collaborative [*24] learning and dialogue, feedback, and critique[,]' . . . would require the Court to make judgments about the quality and value of the education that [the defendant] provided" and were therefore barred by the educational malpractice doctrine) (alterations omitted).

Plaintiffs cite the Court to other cases that have reached the opposite conclusion. For example, in *Salerno, 2020 WL 5583522, at *4-5*, the district court found that the plaintiffs' allegations "that the College's publications clearly implied that courses would be conducted in-person" and that its "materials also touted its many resources and facilities-all of which were located on the campus thereby implying in-person participation" were sufficient to state a claim

15

based upon the breach of an "implied-in-fact contract" under Florida law. The court further concluded that "this case is not about the quality of the College's education" so as to implicate the educational malpractice doctrine, but, rather, "is simply about an alleged promise to provide in-person learning that was allegedly breached." *Id*. at *5. Several other recent

decisions have reached similar conclusions. *See, e.g., McCarthy v. Loyola Marymount Univ.*, No. 2:20-CV-04668-SB (JEMx), 2021 WL 268242, at *3 (C.D. Cal. Jan. 8, 2021) (observing that "[t]he question [*25] here is whether Defendant made a specific promise to provide in-person instruction for the duration of Plaintiff's semester" and concluding that "the purported promise in this case does not involve an academic decision outside the realm of judicial determination," as "the decision to suddenly shift to online education can hardly be characterized as an 'academic decision' within the meaning of that doctrine. Indeed, the decision to cease in-person instruction involved no judgment, much less an academic one, because Defendant was mandated by government orders to do so."); *Hiattv. Brigham Young Univ.*, No. 1:20-CV-00100 (TS), 2021 WL 66298, at *3 (D. Utah Jan. 7, 2021) ("Plaintiff is not asking the Court to interfere in BYU's academic or pedagogical choices by requiring BYU to provide in-person instruction or change its methods of education. Rather, Plaintiff is asking for a refund of tuition and/or mandatory fees for the breach of contract alleged. The requested relief does not require the Court to ask BYU to change its operations or otherwise interfere in BYU's academic decisions, so this argument does not support granting the Motion.");

*Saroya v. Univ. of the Pac.*, No. 5:20-CV-03196 (EJD), 2020 WL 7013598, at *4 (N.D. Cal. Nov. 27, 2020) ("[C]onstruing the FAC in the light most favorable [*26] to Plaintiff, his claim is not that UOP failed to provide students with an adequate education, but that it failed to provide certain services as promised. Notwithstanding Plaintiff's allegations comparing remote learning to in-person learning, ruling on these issues would not require an inquiry into pedagogical methods, the quality

16

of Defendant's instructors and curriculum, or an evaluation of Plaintiff's progress or achievement, or the reasons for their success or failure") (quotation marks, alterations, and citation omitted);

*Chong v. Ne. Univ.*, No. CV 20-10844 (RGS), 2020 WL 7338499, at *2 (D. Mass. Dec. 14, 2020) ("The court is not convinced that plaintiffs' contract claim is merely a disguised educational malpractice claim, as Northeastern implies. The TAC appears to challenge the mere fact of the switch from in-person to online instruction, not the *quality* of the online education Northeastern provided") (citing *Salerno, 2020 WL 5583522, at *5*); *Gibson v. Lynn Univ., Inc.*, No. 20-CIV-81173 (RAR), 2020 WL 7024463, at *4 (S.D. Fla. Nov. 29, 2020)* ("The Court emphasizes that this is not a case about the quality of the education Lynn provided students during the

Spring 2020 semester. Lynn is correct that Florida does not recognize a cause of action for educational malpractice. Rather, Plaintiff's claim is based on Lynn's [*27] alleged failure to provide in-person, on-campus instruction and access to campus facilities and resources.") (internal citation omitted).3

Having considered the divergent views on this issue, the Court agrees with the majority of cases that have deemed the educational malpractice doctrine inapposite to the theory of liability alleged here. The Court further agrees with the district court in *Hassan v. Fordham Univ.*, No. 20-CV-3265 (*KMW), 2021 WL 293255 (S.D.N.Y. Jan. 28, 2021)*, another tuition reimbursement suit brought in the face of the pandemic, that because the Plaintiffs' allegations concerning the lesser

3 Plaintiffs also cite to a number of recent state court decisions that are in accord. *See, e.g* ., *Spiegel v. Trustees ofIndiana University*, No. 53C06 -2005-CT-000771, 2020 WL 7135320, at *2 (Ind. Cir. Ct. Nov. 19, 2020) ("The essence of Plaintiff's claims is that he contracted for in-person classes and certain services, which he never received and for which he paid a premium. This does not challenge the quality of the education, but the actual product and service delivered. Indeed, it would make no difference if what Plaintiff received were actually or a higher value, just that he did not receive that for which he contracted and pre-paid valuable consideration in the form [*28] of tuition and fees. Accordingly, making all inferences in Plaintiff's favor, the Court finds that Plaintiff's claims are not for educational malpractice."); *Smith v. Ohio State University*, No. 2020-00321JD, 2020 WL 5694224, at *2 (Ohio Ct. Cl. Sep. 09, 2020) (holding that where "[t]he essence of plaintiff's breach of contract claim is that she contracted for in-person classes and received online classes instead," the claim was not barred by the educational malpractice doctrine). Quinnipiac challenges Plaintiffs' reliance on many of these state court decisions due to their failure to apply the more rigorous federal pleading standards. The Court need not rely on any state court decisions outside of Connecticut in resolving the instant motion.

17

value of the online instruction that they received "primarily would impact the *damages* element of Plaintiff[s'] contract claim, the Court is not persuaded that they form the 'essence' of the Complaint, such that Plaintiff's claims should be barred entirely at this stage." *Id.* at *4 (emphasis added); *accord Gupta, 239 Conn. at 590* (noting that the doctrine applies "[w]here the essence of the complaint is that an educational institution breached its agreement by failing to provide an

effective education") (quoting *Ross, 957 F.2d at 416*); *see also [*29] Oyoque v. Depaul Univ., No. 20 C 3431, 2021 WL 679231, at *2 (N.D. Ill. Feb. 21, 2021)* ("Though portions of the plaintiffs' allegations *can* be read as talking about the value of online instruction, at its core the complaint's focus is breach of contract-whether DePaul [University] provided the specific services it allegedly promised. To the extent the plaintiffs discuss the difference in value between in-person and online education, that discussion is limited to alleging damages from the defendant's alleged breach of contract, not an allegation that any decreased value *constitutes* the breach of contract"). Indeed, the Connecticut Supreme Court has elsewhere emphasized that the distinction between legally cognizable negligence cases and impermissible educational malpractice cases "lies in the duty that is alleged to have been breached." *Doe v. Yale Univ., 252 Conn. 641, 659, 748 A.2d 834 (2000)*. "If the duty alleged to have been breached is the duty to educate effectively, the claim is not cognizable." *Id.* Although decided in the context of the common law of negligence, the Court finds it instructive that the standard articulated by the Connecticut Supreme Court does not focus on the nature of damages as the *sine qua non* to ascertaining whether a suit is fundamentally one of educational malpractice. Rather, at least implicitly, [*30] it looks to the theory of liability alleged, which here, is a breach of contract.

Here, as discussed in many of the cases cited above, the promise alleged to have been breached is not a promise to provide an effective or adequate education but instead to provide an

18

in-person education. The Court therefore disagrees with the Defendant that the fact finder would necessarily be called upon to assess such questions as whether a lecture delivered by Zoom is less valuable than one offered in person, whether students' virtual interactions with faculty members are less educationally meaningful than in-person interactions, or whether remote library and other related services failed to provide an appropriate level of support following the closure of on-campus facilities. (Def.'s Mem. at 16.) Because it appears plausible from the face of the complaint that Plaintiffs' claims may be capable of resolution without inviting such subjective assessments of educational quality, and because Plaintiffs have pled the breach of a specific contractual promise, as discussed, *infra*, the educational malpractice doctrine does not bar their claims at this stage. The Court reaches the same conclusion with respect [*31] to Plaintiffs' unjust enrichment claims, which are based on an implied in law theory of contract liability.

However, if in the future it becomes manifest that resolving

Plaintiffs' claims or assessing their damages will ultimately "entail[] evaluation of whether a course conducted remotely was less valuable than one conducted in person-and if so, by how much-the Court [will reassess whether it] should decline to enter the classroom and determine whether or not the judgments and conduct of professional educators were deficient." *Hassan, 2021 WL 293255, at \*4* (quotation marks and citation omitted).

**Whether Plaintiffs Have Adequately Pled the Breach of a Specific Promise**

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v.Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., 311 Conn. 282, 291, 87 A.3d 534 (2014)*. Connecticut law recognizes that "'[t]he basic legal relation between a student and a private university or college is contractual in nature' and 'there seems to be no dissent from the proposition

19

that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual

relationship between the student and the educational institution.'" *Doe v. Quinnipiac Univ [\*32]* ., 404

F. Supp. 3d 643, 667 (D. Conn. 2019) (quoting *Burns v. Quinnipiac Univ., 120 Conn. App. 311*,

320-21, *991 A.2d 666 (App. Ct. 2010))*. "Because a student bases his or her decision to attend a

college or university, in significant part, on the documents received concerning core matters, such

as faculty, curriculum, requirements, costs, facilities and special programs, application of contract

principles based on these documents and other express or implied promises, consistent with the

limitations expressed in *Gupta* . . . appears sound." *Johnson v. Schmitz, 119 F. Supp. 2d 90, 93*

(D. Conn. 2000).

Here, Plaintiffs allege the breach of either an express contract or, in the alternative, an

implied contract, which the Court construes as an implied in fact contract. "An implied in

fact contract is the same as an express contract, except that assent is not expressed in words, but is

implied from the conduct of the parties." *Vertex, Inc., 278 Conn. at 573-74*.

[A] true implied in fact contract can only exist . . . where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words. Such a contract arises where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself **[\*33]** of the benefit of those services. In such a case, the law implies from the circumstances, a promise by the defendant to pay the plaintiff what those services are reasonably worth.

*Janusauskas v. Fichman, 264 Conn. 796, 804-05, 826 A.2d 1066 (2003)* (quotation marks and

citations omitted).4

Quinnipiac principally disputes Plaintiffs' ability to establish the first element of a breach

of contract claim-*i.e.*, the formation of an agreement to provide on-campus instruction. It asserts

4As noted *supra*, an implied in law contract, on the other hand, "may arise due to one party being unjustly enriched to the detriment of the other party." *Vertex, Inc., 278 Conn. at 574*. The Court addresses Plaintiffs' implied in law contract, or unjust enrichment claim, in the context of Count Three below.

20

that "the promise on which a plaintiff relied must have been precise and based on specific contractual terms or provisions" in order to plead a viable breach of contract claim consistent with the second *Gupta* exception. (Def.'s Mem. at 20 (quoting *Kloth-Zanard v. Amridge Univ.*, No. 3:09-CV-606 *(JBA), 2012 WL 2397161, at \*4 (D. Conn. June 25, 2012)*.) Quinnipiac further argues that "general, vague, or aspirational language" such as that evidenced in the Bulletin is insufficient to meet *Gupta's* standard. (*Id.*) *See Faigel v. Fairfield Univ., 75 Conn. App. 37, 41- 42, 815 A.2d 140 (App. Ct. 2003)* (holding that defendant's alleged oral promise **[\*34]** that plaintiff "would receive 'many credits'" for her prior engineering studies in Russia did not qualify as a "specific contractual promise" under *Gupta*); *see also, e.g., McNeil v. Yale Univ., 436 F. Supp. 3d 489, 532-33 (D. Conn. 2020)* (holding that "[t]he general language relied on by Plaintiffs from Yale's Equal Opportunity Statement, Undergraduate

Regulations and Sexual Misconduct Policies" did not create enforceable promise to provide educational programs and student organizations free of sex discrimination and sexual misconduct, as these promises were insufficiently specific and also implicated the educational malpractice doctrine by requiring the court to assess the reasonableness of Yale's efforts at eliminating sexual misconduct and discrimination); *Kloth-Zanard, 2012 WL 2397161, at \*4* (holding, in breach of contract action premised on institution's alleged failure to fulfill its obligations to assist the plaintiff in securing a clinical training program, that representative's statements that the university "would 'assist' students 'in making sure you get that part of your training done,' . . . does not amount to a 'specific promise' as to the extent or nature of assistance that would be provided" and reaching same conclusion with respect to the plaintiff's allegation that **[\*35]** a faculty member told her "that he would help students 'in any way' he could . . . to procure a clinical site placement"); *accord Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 709 (D. Vt. 2012), aff'd, 570 F. App'x 66 (2d Cir. 2014)* ("Language in a college handbook

21

or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable") (applying Vermont law).5

Here, however, Plaintiffs have alleged more than mere "aspirational" language illustrated in the Bulletin and Quinnipiac's website-which tout such features as "state-of-the-art facilities," "outdoor spaces," "classroom and immersive experiential learning," and "the beauty of New England." (*E.g.*, FAC ¶¶ 28, 30, 31, 37.) Plaintiffs further allege that Quinnipiac charges students significantly less for online degree programs-between \$515 and \$575 per credit for undergraduate online degree programs, as compared to between \$1,517.50 and \$2,023.33 per credit for on-campus students taking between 12 and 16 credit hours. (*Id.* ¶¶ 45, 48). Such allegations in combination with the parties' alleged course of conduct allow the reasonable inference that the parties may have at least implicitly entered into a specific agreement for **[\*36]** on-campus instruction by virtue of the Plaintiffs having been charged under, and paid, the higher of

5 In addition, Quinnipiac cites *Chong v. Ne. Univ.*, No. CV 20-10844 (RGS), 2020 WL 5847626 (D. Mass. Oct. 1, 2020), in which the district court dismissed, *inter alia*, a breach of contract claim premised on Northeastern University's alleged failure to reimburse students for tuition remitted during the pandemic. The district court agreed with the defendant that plaintiffs failed to state a claim for breach of an annual

Financial Responsibility Agreement ("FRA"), which "ties the payment of tuition to registration for courses, not to the receipt of any particular method of course instruction." *Id.* at \*3. The court further noted that plaintiffs did "not plead that the course descriptions provided by the Northeastern Registrar comprised part of the parties' contract" and their complaint also "lacks any allegation which might allow the court to reasonably infer that these descriptions were meant to be read 'in conjunction with' the FRA." *Id.* Notably, the court dismissed the plaintiffs' tuition reimbursement claims without prejudice and permitted the claims to proceed following the filing of the plaintiffs' third amended complaint. *See Chong, 2020 WL 7338499, at \*3* (denying **[\*37]** subsequent motion to dismiss, as "[d]rawing all inferences in plaintiffs' favor, the court cannot, as a matter of law, say that no student who read these statements could have reasonably expected that executing the FRA and registering for on campus courses would entitle them to in-person instruction").

Quinnipiac also cites *Squeri v. Mount Ida Coll., 954 F.3d 56 (1st Cir. 2020)*, a case in which the First Circuit affirmed dismissal of a breach of contract claim, among others, brought against Mount Ida College after it permanently closed upon providing only six weeks' notice to its students. "Underlying all the claims were allegations that the defendants knew that Mount Ida was on the brink of insolvency but concealed this information, instead assuring current and prospective students that Mount Ida was financially stable." *Id. at 61*. The First Circuit held that the contract claim failed for lack of specificity, as the plaintiffs did "not plausibly allege a breach of implied contract, let alone an express contract, that the college contracted to give earlier notice than it did or that there was a contract for four years of education in exchange for only one semester of tuition." *Id. at 71-72*. Unlike here, the plaintiffs did "not allege the terms of any such **[\*38]** contract," *id. at 71*, and the Court otherwise finds the case inapposite.

22

these two tuition schemes while attending in-person classes during the first half of the Spring 2020 semester.6 *See Rosado v. Barry Univ. Inc.*, No. 1:20-CV-21813 *(JEM), 2020 WL 6438684, at \*3 (S.D. Fla. Oct. 30, 2020)* (concluding that the plaintiff's "allegations that Barry [University] accepted \$773 more per credit for in-person classes from [the plaintiff], and actually provided in-person education to [the plaintiff] until March 19, 2020, in the backdrop of numerous other documents referring to in-person classes and amenities, are sufficient to establish, at minimum, an implied contract") (applying Florida law); *see also Bergeron, 2020 WL 7486682, at \*7-8* (finding plaintiffs' allegations of the defendant's promise to provide in-person instruction sufficiently specific

to withstand motion to dismiss where they "allege a number promises made by [the defendant] with respect to the benefits of enrollment in the more expensive in-person, on-campus program, including: the opportunity to work directly with faculty members in their labs, multi-faceted experiential learning, vibrant campus life, 'access to the finest laboratories, technology, and computing facilities available on any campus', and 'a strong and **[\*39]** robust network of support on campus to help you succeed,'" as "[t]hese allegations clearly extend beyond coursework to the entirety of the educational experience.") (internal citations omitted) (applying New York law);

*Espejo, 2021 WL 810159, at \*5* (expressing doubt "that the vast majority of Plaintiffs' allegations," which relied on Cornell University's marketing, course registration, and related materials, "give rise to a contractual agreement for in-person instruction," but permitting case to proceed past motion to dismiss based principally on allegation that Cornell defined "'experiences in the classroom and 'on campus'" as part of its mission statement, which the court construed as "an explicit statement from the university indicating that the education for which Plaintiffs paid

6 Whether the allegations sufficiently plead the existence of an express contract is a closer call but the Court finds that the issue of whether and to what extent the parties may have entered into an express or an implied contract for the provision of in-person educational services will be better resolved following discovery.

23

includes an on-campus component") (applying New York law); *but see Gociman, 2021 WL 243573, at \*4* (rejecting plaintiffs' argument "that **[\*40]** in-person instruction was implied by the difference in tuition for the 'in-person' and 'online-program,'" as "[a] difference in tuition is insufficient to allege a specific contractual promise" under Illinois law).

In addition, although it is true, as Quinnipiac points out, that the Bulletin distinguishes between "undergraduate and graduate classes' and "online classes" as opposed to "on-campus" and "online classes," the Bulletin's Academic Calendar does provide different dates for when "Undergraduate and graduate on-campus classes end" and "Online classes end." (*See* FAC Ex. C at 14-16 of 749.) And even where the Academic Calendar refers simply to "Undergraduate and graduate classes" without the "on-campus" qualification, the very fact of distinguishing between undergraduate/graduate classes and "online classes" can plausibly read as suggesting that the former are held on-site. While discovery may ultimately defeat Plaintiffs' ability to

demonstrate the existence of an express or implied contract based on the Bulletin and other course materials, the Court deems Plaintiffs' allegations sufficient at this stage to allow the inference of a specific promise to provide in-person instruction, **[\*41]** and will accordingly deny the motion to dismiss the breach of contract claims.7

**Unjust Enrichment**

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Town of New Hartford v. Connecticut*

7 Quinnipiac also notes that it "reserved the right to change any provision of the Bulletin at any time." (Def.'s Mem. at 26 (quoting Bulletin at 3 of 749) (alterations omitted).) It further notes that the Bulletin does not include any provision allowing for a refund of tuition or fees under the circumstances alleged. However the Court deems such questions as to whether the specific terms of the alleged contract permit or preclude Plaintiffs' recovery improper for resolution without further factual development.

24

*Res. Recovery Auth., 291 Conn. 433, 451, 970 A.2d 592 (2009)* (quotation marks and citation omitted). "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Id. at 451-52* (quotation marks **[\*42]** and citation omitted).

Quinnipiac argues that Plaintiffs cannot maintain an unjust enrichment claim when they have pled the existence of an enforceable contract. However, the Federal Rules of Civil Procedure specifically contemplate and permit a plaintiff to plead in the alternative. *See Fed. R. Civ. P. 8(d)(3)* ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see also, e.g.*, *NovaFund Advisors, LLC v. Capitala Grp., LLC*, No. 3:18-*CV-1023 (MPS), 2019 WL 1173019, at \*15 (D. Conn. Mar. 13, 2019)* ("[B]ecause NovaFund's [unjust] enrichment claim is adequately pleaded in the alternative under *Rule 8*, and the existence of the contract is in genuine dispute, dismissal of this claim would be premature").8Therefore, in light of the parties' dispute as to the existence of an enforceable contract, dismissal of the Plaintiffs' unjust enrichment claim is inappropriate at this juncture.

Quinnipiac also argues that Plaintiffs have failed to allege Quinnipiac's unjust retention of non-gratuitous benefits, citing

*Roe v. Loyola Univ. New Orleans, No. Civ. 07-1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007)*, a case that arose from the closure of Loyola University New Orleans in the aftermath of Hurricane Katrina. Loyola College of Law, where the plaintiff was enrolled, arranged for its students to attend classes at other ABA-accredited law **[\*43]** schools during

8 Even if this issue is governed by substantive Connecticut law under the *Erie* doctrine, which the Court does not believe, pleading in the alternative is appropriate. *See Stein v. Horton , 99 Conn. App. 477, 485, 914 A.2d 606 (App. Ct. 2007)* ("Parties routinely plead alternative counts alleging breach of contract and unjust enrichment, although in doing so, they are entitled only to a single measure of damages arising out of these alternative claims. . . . Under this typical belt and suspenders approach, the equitable claim is brought in an alternative count to ensure that the plaintiff receives some recovery in the event that the contract claim fails.").

25

the fall 2005 semester and to receive full credit from those courses toward their Loyola degrees, provided the students paid their tuition to Loyola. The plaintiff relocated to Dallas, where he attended SMU Law School during the fall of 2005 before returning to New Orleans to finish his degree at Loyola. He later brought a tuition refund suit against Loyola in which he asserted, *interalia*, an unjust enrichment claim.9 The district court granted summary judgment to the defendant on the unjust enrichment claim, first holding that the plaintiff failed to demonstrate "an impoverishment of **[\*44]** the plaintiff" given that he received full credit for the SMU courses and graduated and sat for the bar exam on time. *Id.* at *2-3. The Court also noted that "the undisputed facts establish that there is 'no absence of justification or cause' for Loyola's retention of the tuition for the fall 2005 semester" given that Loyola took the actions it did to prevent its students from falling behind, and that if the plaintiff had enrolled at SMU directly he would have been obligated to pay SMU's higher tuition. *Id.* at 3.

Plaintiffs distinguish *Roe* by pointing out that the plaintiff there was provided the option to attend another law school given Loyola's inability to operate after Hurricane Katrina, whereas Plaintiffs here were not afforded a choice-they were either required to attend classes online or forfeit an entire semester's worth of tuition. And unlike the plaintiff in *Roe*, Plaintiffs are not seeking a "tuition-free" semester. (Pl.'s Mem. at 23.) Quinnipiac also relies on *Roe* for the proposition that Quinnipiac had no choice but to enact emergency measures in the face of the pandemic, noting that even if it had not decided to close it campus independently it would have been required to do so by Governor **[\*45]** Lamont's

executive orders. However the question is not whether Quinnipiac was justified in moving its classes online, but whether it was unjust for it to

9 To prevail on such a claim under Louisiana law, a plaintiff must prove five elements: "(1) there must be an enrichment of the defendant; (2) there must be an impoverishment of the plaintiff; (3) there must be a connection between the enrichment and resulting impoverishment; (4) there must be an absence of 'justification' or 'cause' for the enrichment or impoverishment; and (5) no other remedy available at law." *Id.* at *2.

26

retain tuition that it accrued with the expectation of delivering (allegedly higher cost) in-person instruction when it ultimately provided an (allegedly lesser-cost) online education for the latter half of the Spring 2020 semester. In this way Plaintiffs have adequately alleged that Plaintiffs "paid Defendant non-gratuitous benefits for a comprehensive academic experience, including in-person classes, opportunities to network with students and professors in-person, access to campus buildings and dormitories, and to avail themselves of school programs and events." (FAC ¶ 121.) It can be reasonably inferred from these allegations **[\*46]** that Quinnipiac accrued excess funds by moving its courses online, and the question of whether the institution was unjustly enriched by retaining the Plaintiffs' tuition-which allegedly encompassed the costs of delivering in-person instruction and all of the attendant benefits that flow from it-is a question improper for resolution on a motion to dismiss.

**Conversion**

"Conversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab, Inc. v.Auctions Worldwide, LLC, 284 Conn. 408, 418, 934 A.2d 227 (2007)*. "To establish a prima facie case of conversion, the plaintiff[s] [must] demonstrate that (1) the material at issue belonged to the plaintiff[s], (2) that the defendant deprived the plaintiff[s] of that material for an indefinite period of time, (3) that the defendant's conduct was unauthorized and (4) that the defendant's conduct harmed the plaintiff[s]." *Coster v. DuQuette, 119 Conn. App. 827, 832, 990 A.2d 362 (App. Ct. 2010)* (quotation marks and citation omitted). "[T]he party alleging conversion . . . must prove a sufficient property interest in the items in question." *Mystic Color Lab, 284 Conn. at 419*. "Accordingly, a claim for conversion may be brought when the relationship is one of bailor and bailee but not when it is one of debtor and creditor." *Id.* "A bailment **[\*47]** . . . contemplates redelivery

27

of goods entrusted to the bailee, whereas a debtor-creditor relationship contemplates the payment of an obligation defined by agreement between the parties." *Id. at 420*. "Moreover, in order to establish a valid claim of conversion or statutory theft for money owed, a party must show ownership or the right to possess specific, identifiable money, rather than the right to the payment of money generally." *Id. at 421*. Thus "[w]hen an action arises from a claim under an express or implied contract, a claim in tort is inappropriate." *Id.*

Quinnipiac argues convincingly that Plaintiffs' claim of entitlement to a tuition refund sounds in breach of contract and thus cannot be enforced via a conversion action. *Cf. Aztec EnergyPartners, Inc. v. Sensor Switch, Inc., 531 F. Supp. 2d 226, 230 (D. Conn. 2007)* ("Clearly, Aztec expected to receive a refund in exchange for returning the products and relinquishing title to them, but that is a claim sounding in breach of contract, not conversion"). As the bailee/bailor vs. debtor/creditor distinction recognized by the Connecticut Supreme Court illustrates, where the dispute arises from the defendant's failure to remit or refund payment pursuant to an agreement between the parties as opposed to the defendant's failure to return **[*48]** property held in trust for the plaintiff, the tort of conversion is inapposite. For similar reasons Quinnipiac correctly emphasizes that Plaintiffs have not plausibly alleged that the purportedly wrongfully held tuition actually "belonged" to the Plaintiffs, once Plaintiffs relinquished it by paying for the semester. When funds are intermingled with funds belonging to third parties, a bailment cannot exist, *see Mystic ColorLabs, 284 Conn. at 420*-thus, once Quinnipiac deposited Plaintiffs' funds into its general account, they became "unidentifiable and untraceable," thereby defeating Plaintiffs' entitlement to any specific set of funds, *id. at 427*. Plaintiffs also misapprehend the requirement that the funds be identified with "specificity" when they insist that they have adequately pled conversion by identifying the amount that Quinnipiac charged Plaintiffs for its tuition and fees. The issue is not

28

whether the funds are "specific" in a quantifiable sense but whether they are traceable to Plaintiffs so as to sustain a specific property interest at the time that the funds were held by Quinnipiac. *See, e.g., Ford, 2020 WL 7389155, at *9* (dismissing conversion claim in similar tuition reimbursement suit, as "plaintiffs have failed to allege that their tuition **[*49]** and fee payments still exist as a 'specific, identifiable fund' that defendant could have converted" and "cannot realistically argue that once that money was paid to defendant it remained intact, as opposed to pooling in with defendant's other

funding") (applying New York law).

In short, Plaintiffs may not rely on the same allegations that give rise to their contract claims to bring a claim for conversion.

**Conclusion**

For the foregoing reasons, the Parent Plaintiffs are dismissed from this suit and the Defendant's motion to dismiss is granted as to the conversion claim. The motion is denied in all other respects.

**SO ORDERED** at Bridgeport, Connecticut, this 25th day of March 2021.

*/s/ Kari A. Dooley*

KARI A. DOOLEY

UNITED STATES DISTRICT JUDGE

29

**End of Document**